Paul STONE and Ronald Corbin, individually and on behalf of all residents of Kanawha County and the State of West Virginia similarly situated; Ginger Brookover, individually and on behalf of all residents of Monongalia County and on behalf of all other residents of West Virginia similarly situated; and Beth Good, individually and on behalf of all residents of Tucker County and of all residents of West Virginia similarly situated, Plaintiffs,

v.

Ken HECHLER, Secretary of State of West Virginia, in his official capacity; Robert "Chuck" Chambers, in his official capacity as Speaker of the West Virginia House of Delegates; and Keith Burdette, in his official capacity as President of the West Virginia Senate, Defendants.

Civ. A. No. 91–0110–E.

United States District Court,
N.D. West Virginia.

Jan. 7, 1992.

John W. Cooper, Parsons, W.Va., for plaintiffs.

Richard L. Gottlieb, Charleston, W.Va., for Hechler. Debra L. Hamilton, Charleston, W.Va., for Chambers and Burdette.

Before SPROUSE, Circuit Judge, MAXWELL, Chief Judge, and STAMP, District Judge.

## MEMORANDUM OPINION

### PER CURIAM.

Plaintiffs Stone, Corbin, Brookover, and Good (hereafter collectively "Stone") bring this action seeking a declaration that the congressional redistricting plan enacted by the West Virginia Legislature during its 1991 special session, codified as amended at West Virginia Code Chapter One, Article Two, Section Three (hereafter West Va. Code § 1-2-3), is unconstitutional. They contend that the statute neither provides for districts of equal population nor adequately justifies the population deviation among the districts included in the plan. The parties have fully briefed the issues raised by Stone's complaint and on December 13, 1991, the Court received evidence from the parties and heard argument by counsel. The parties submitted proposed findings of fact and conclusions of law to the Court on December 18, 1991.

Based upon a review of the applicable law and all other materials before it, this Court concludes that while West Va.Code § 1-2-3 deviates from the standard of population equality established by the United States Supreme Court in *Karcher v. Daggett*, 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983), the State has shown that the deviations were necessary to achieve legitimate state goals. Accordingly, this Court finds that West Va.Code § 1-2-3 is constitutional. Stone's complaint is DISMISSED.

### I. Background

West Virginia's decline in population relative to the populations of the other forty-nine states, as determined by the 1990 census, reduced West Virginia's congressional delegation from four members to three. The representatives for the three new districts are to be first elected in the 1992 congressional election. In response to the reduction in the State's congressional delegation, the West Virginia Legislature enacted amended House Bill 221 establishing the three districts from which West Virginia's members in the United States House of Representatives shall be elected. Governor Gaston Caperton signed amended House Bill 221 into law on October 17, 1991, and it is now codified as Chapter 1, Article 2, Section 3 of the West Virginia Code.

On April 1, 1991, Stone filed Civil Action 91–0033–E in this Court attacking the constitutionality of West Virginia Code § 1-2-3 as it existed prior to the enactment of the new congressional reapportionment law.[1] A similar suit, styled *Charles Damron, et al. v. Ken Hechler*, was filed in the United States District Court for the Southern District of West Virginia on March 13, 1991.[2]

Chief Judge Sam J. Ervin, III, of the United States Court of Appeals for the Fourth Circuit appointed Circuit Judge James M. Sprouse and District Judge Frederick P. Stamp, Jr., to serve with Chief District Judge Robert E. Maxwell in Civil Action 91–0033–E pursuant to 28 U.S.C. § 2284.

On October 16, 1991, Stone filed the instant complaint—Civil Action 91–0110–E—seeking a determination that the plan adopted by the Legislature, West Va.Code § 1-2-3, violated the United States and West Virginia Constitutions. Chief Judge Ervin appointed the same members to the panel hearing Civil Action No. 91–0110–E as had previously been named to the panel hearing Civil Action No. 91–0033–E. The panel dismissed as moot Civil Action No. 91–0033–E on December 13, 1991. It is the

---

**1.** Stone sought to have this Court review the four-district plan adopted by the Legislature in 1981 and codified at West Virginia Code § 1-2-3 (1990).

**2.** The Court understands that motions to intervene and plaintiffs' motion to dismiss are pending in the Southern District case. As of December 13, 1991, no hearing had been scheduled in the Southern District of West Virginia.

October action—Civil Action No. 91–0110–E—that we now consider.

The Court has jurisdiction over Stone's complaint pursuant to 28 U.S.C. §§ 1343(3), 2201, and 2202, and venue lies in this Court under 28 U.S.C. § 1391(b)(2).

Defendant Ken Hechler is sued in his official capacity as the Secretary of State of West Virginia. Under West Virginia Code § 3–1A–6, the Secretary of State is the chief election official for West Virginia, with supervisory and other authority over all other election officials in the State. Additionally, under West Virginia Code § 3–5–9, the Secretary of State is charged with certifying the congressional candidates who have filed for the primary election and notifying the circuit clerk of each county as to which candidates are to appear on the primary ballot. Defendant Keith Burdette is sued in his official capacity as the President of the West Virginia Senate. Defendant Robert "Chuck" Chambers is sued in his official capacity as Speaker of the West Virginia House of Delegates.

Plaintiffs Paul Stone and Ronald Corbin are residents of Kanawha County, West Virginia, and are registered to vote in the 1992 Primary and General Elections. Under West Va.Code § 1–2–3, Stone and Corbin are placed in the Second Congressional District. Plaintiff Ginger Brookover is a resident of Monongalia County, West Virginia, and is registered to vote in the 1992 Primary and General Elections. Under West Va.Code § 1–2–3, Brookover is placed in the First Congressional District. Plaintiff Beth Good is a resident of Tucker County, West Virginia, and is registered to vote in the 1992 Primary and General Elec-

tions. Under West Va.Code § 1–2–3, Good is placed in the First Congressional District.

## II. Findings of Fact

### A.

According to the 1990 Census, West Virginia has a population of 1,793,477, a decline of 156,167 persons from 1980. As a result of the population decline, and in accordance with Article One, Section Two and the Fourteenth Amendment of the United States Constitution,[3] West Virginia's congressional delegation to be elected beginning in 1992 will consist of three members, one less than the four members that the State has had since 1972.

Upon certification of the results of the 1990 census to the State, and in compliance with Article One, Section Four of the West Virginia Constitution,[4] each house of the West Virginia Legislature appointed a Select Committee on Redistricting to develop a new congressional plan. Senator William R. Wooton and Delegate Charles Damron chaired, respectively, the Senate and House Select Committees. The House of Delegates and the Senate considered at least fifty proposals during the 1991 regular session but were unable to agree upon a redistricting plan. The proceedings included a joint public hearing, at which Stone's witnesses spoke; committee meetings at which members heard explanations of applicable law; and, of course, sessions in both Houses to debate the merits of submitted plans. This process continued during an extraordinary session of the Legislature which was convened in September of 1991.

---

**3.** Article One, Section Two states, in pertinent part: "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors of each State shall have Qualifications requisite for Electors of the most numerous Branch of the State Legislature." U.S. CONST. art. I, § 2.

Section Two of the Fourteenth Amendment states, in pertinent part: "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State...." U.S. CONST. amend. XIV, § 2.

**4.** Article One, Section Four of the West Virginia Constitution states:

For the election of representatives to Congress, the State shall be divided into districts, corresponding in number with the representatives to which it might be entitled; which districts shall be formed of contiguous counties, and be compact. Each district shall contain as nearly as may be, an equal number of population, to be determined according to the rule prescribed in the Constitution of the United States.

W.VA. CONST. art. I, § 4.

During the September 1991 Special Session, at which nine additional plans were submitted, the House passed House Bill 221, embodying the congressional redistricting plan identified as Plan W1 and embraced by Stone. The Senate, however, amended House Bill 221 by substituting Plan II, which is supported by the State in this action, for Plan W1. The House of Delegates passed the amended bill and on October 17, 1991, it became law as Chapter One, Article Two, Section Three of the West Virginia Code.

The new West Va.Code § 1–2–3 creates the three new congressional districts by dividing the State into three roughly horizontal districts of contiguous counties bounded by county lines. Ideally, two congressional districts would encompass 597,826 persons and one congressional district would encompass 597,825 persons. Under West Va. § 1–2–3, the First Congressional District has a population of 598,056; the Second Congressional District has a population of 597,921; and the Third Congressional District has a population of 597,500. Between the first district with the highest population and the third district with the lowest population, there is a maximum population deviation of 556 persons.[5] This calculates to a deviation of nine one hundredths of one percent from the ideal district population of 597,826.[6] Seventeen of the fifty-eight other plans considered by the Legislature had a lower variance than Plan II.

Under West Va.Code § 1–2–3, all of the counties in the current First Congressional District are in the new First Congressional District. All of the counties in the current Third Congressional District except Boone and Lincoln are in the new Second Congressional District. All of the counties in the current Fourth Congressional District are in the new Third Congressional District. The counties comprising the current Second Congressional District are now divided among the new First, Second, and Third Districts. Monongalia, Preston, Barbour, Tucker, Grant, and Mineral counties from the current Second Congressional District are in the new First Congressional District. Jefferson, Berkeley, Morgan, Hampshire, Hardy, Pendleton, Randolph, and Upshur counties from the current Second Congressional District are in the new Second Congressional District. Pocahontas, Webster, Greenbrier, Fayette, Summers, and Monroe counties from the current Second Congressional District are in the new Third Congressional District.

Plan W1, the plan originally embodying House Bill 221 before amendment by the Senate and which is supported by Stone, would have divided the State into two roughly northeast to southwest districts and one roughly horizontal district along the southernmost portion of the State, each consisting of contiguous counties bounded by county lines.[7] Under Plan W1, the First Congressional District would have a population of 597,819; the Second Congressional District would have a population of 597,834; and the Third Congressional District would have a population of 597,824. The districts proposed in Plan W1 have a maximum population deviation of 15 persons or 0.0025% from the ideal district. Plan W1 had the lowest variance of any of the redistricting plans considered by the Legislature.

Under Plan W1, all of the counties in the current First Congressional District except Doddridge and Harrison would remain in the new First Congressional District. All of the counties in the current Second Congressional District except Greenbrier, Summers, and Monroe would remain in the new Second Congressional District. All of the counties in the current Fourth Congressional District would be in the new Third Congressional District. In general, Plan W1 divides the counties that comprise the current Third District among the new First, Second, and Third Congressional Districts.

---

**5.** A map of the three congressional districts adopted by the Legislature and provided under West Va.Code § 1–2–3 as well as a map of Plan W1 endorsed by Stone are attached to this memorandum opinion as an appendix.

**6.** Computed as 556 divided by 597,826, resulting in .000930036 or 0.09 percent.

**7.** See Map 2 at Appendix.

Kanawha, Jackson, and Gilmer counties would be in the new First Congressional District. Wirt, Roane, Calhoun, Clay, Nicholas, Braxton, and Lewis counties would be in the new Second Congressional District. Mason, Putnam, Boone and Lincoln counties would be in the new Third Congressional District.

### B.

We find that during consideration and debate in both legislative bodies, individual members understood the underlying constitutional problems but differed over both their appropriate resolution and the relative importance of underlying state concerns. For example, during the floor debate in the West Virginia Senate on October 9, 1991, Senator Wooton, Chairman of the Senate Select Committee on Redistricting, stated that under Plan W1, the current First and Third Congressional Districts would completely lose their identity, while under Plan II, only the current Second Congressional District would lose its identity. Senator Wooton further stated that because West Virginia loses one representative, the cores of only three districts could be preserved. He concluded that Plan II preserved the cores of three districts, while Plan W1 preserved the cores of only two districts. Senator Helmick, advocating Plan W1, disagreed with Senator Wooton and stated that "W1 retains the identity of the northern and Kanawha County district ..." Senator Helmick also argued that Plan W1 gave each sitting Congressman an equal opportunity for reelection, while Plan II gave the Congressman from the current Second Congressional District the least population base of any of the plans being considered.

During the debate on the redistricting plan in the House of Delegates, Delegate Love stated that Plan II divided the State horizontally and kept the State's economic areas together in cohesive groupings. Delegate Vest also concluded that Plan II better preserved the economic areas of West Virginia. Delegate Mezzatesta disagreed with Delegates Love and Vest, insisting that the State's agricultural areas were better preserved under Plan W1. Delegate Damron, Chairman of the House Select Committee on Redistricting, explained his vote against the amended bill which incorporated Plan II, stating that Plan W1 better preserved the community of interests of the State. Delegate Damron also stated that "by the three standard tests of compactness," Plan W1 was superior to Plan II.

### C.

We conclude from the evidence that, in attempting to reapportion according to their understanding of the applicable law, individual legislators, advocating both Plan II and Plan W1, were concerned both with preserving as much as possible of the cores of the existing four districts as they were reduced to three and with achieving compactness in all three of the new districts as well as with satisfying the requirements of the West Virginia Constitution.

### 1.

Opposing proponents of the various plans considered the effect of redistricting on preservation of the cores of the existing four districts. Although Plan HH was not much considered during debate, a review of the sixteen viable Plans consisting of contiguous counties with a lower population variance than Plan II (hereafter viable Plans),[8] including Plan W1, demonstrates that only Plan HH would retain intact all of the counties from two of the current congressional districts in two of the new congressional districts.[9] However, in compar-

---

8. As stipulated by the parties, Plan FF was deemed by the Legislature not to consist of contiguous counties because Preston County is not bounded by the county lines of any other counties in the proposed second congressional district. As contiguity is required under the West Virginia Constitution, Plan FF is not a viable alternative plan to West Va.Code § 1–2–3 and will not be considered by this Court.

9. Plans I, J, K, L, U1, V1, W1, BB, CC, DD, EE, and GG would retain intact all of the counties from one of the current congressional districts in one of the new congressional districts. Plans A, C, and Y would not retain intact all of the counties from any of the current congressional districts in any of the new congressional districts.

ing Plans HH and II, we note that Plan II best preserves a third current congressional district by severing only two counties with a population of 47,252.[10] Plan HH severs four counties with a population of 115,265. Plan W1, which Stone favors, is the third best plan, severing five counties with a population of 137,668.[11] In sum, even though a number of the other Plans considered by the Legislature had lower population variances, Plan II preserves the cores of three prior districts, as defined by the Legislature, better than any other plan.

2.

The principal evidence concerning compactness was contained in the affidavits of two experts introduced into evidence by agreement of the parties. Thornton Cooper authored Plan W1 and submitted it to the Select Committees on Redistricting on February 27, 1991. Craig N. Butler, the State's expert, is the principal designer and developer of the computer software used by the West Virginia Legislature in redistricting the State's congressional districts. Both experts calculated the compactness of the congressional districts under West Va. Code § 1-2-3 and the viable Plans.

Both experts generally agreed that compactness, a relative measure, is difficult to achieve in West Virginia, that both Plan II and Plan W1 are somewhat compact under general theories of compactness, and that alternate Plans are even slightly more compact than either Plan II or Plan W1. Although both experts agreed that at least three tests exist to measure compactness— the perimeter test, the *Reock* test, and the *Schwartzberg* test [12]—they disagreed over which test was best suited to West Virginia's geographical configuration and over the implications of the measurements each test generates.

The State's expert, Butler, prefers the perimeter test, under which its Plan II ranks seventh as contrasted to Stone's Plan W1, which ranks tenth.[13] Butler believes this test is the best measure of compactness for West Virginia because both the *Reock* test and the *Schwartzberg* test are severely affected by the overall shape of the State.

10. By "population severed," this Court means the minimum population from the current congressional districts that are not together in the new districts. This Court has calculated the minimum number of people that would have to be shifted among the new districts in order to preserve intact three of the current congressional districts.

11. None of the other fourteen viable Plans substantively matches Plan II in terms of preserving in tact three of the current congressional districts. Plan A severs fourteen counties with a population of 382,326; Plan C severs fourteen counties with a population of 299,526; Plan I severs eight counties with a population of 234,-551; Plan J severs seven counties with a population of 177,426; Plan K severs eight counties with a population of 224,520; Plan L severs ten counties with a population of 251,893; Plan Y severs fourteen counties with a population of 299,526; Plan U1 severs six counties with a population of 152,812; Plan V1 severs ten counties with a population of 186,627; Plan BB severs seven counties with a population of 163,045; Plan CC severs six counties with a population of 147,901; Plan DD severs eight counties with a population of 166,622; Plan EE severs twelve counties with a population of 295,045; and Plan GG severs seven counties with a population of 155,301.

12. The total perimeter test measures the total length of district boundaries across an entire congressional districting plan. In the perimeter test, the lower the total perimeter, the more compact the plan.

The Reock test locates the two points on each district's perimeter that are furthest apart and then uses the distance between the points as a diameter to construct the smallest circle completely encompassing the district. The ratio of the district's area to the area of the circle is then computed, resulting in a number between 0.00 and 1.00. The nearer the ratio is to 1.00, the more compact the district.

The Schwartzberg test calculates the adjusted perimeter by connecting with straight lines those points on a district boundary where three or more census units from any district meet. The area of the district is used as the area of a circle whose perimeter is then calculated. The length of the adjusted perimeter is divided by the perimeter of the circle to arrive at a resulting value between 1.00 and infinity. The closer the resulting value is to 1.00, the more compact the district is deemed to be.

13. Considering only Plan II and the sixteen viable Plans, Plan K is first followed by Plans I; HH; J; L; BB; II; V1; U1; W1; DD; CC; GG; EE; A; and C and Y (tie).

In contrast, Stone's expert, Cooper, prefers the *Reock* test, under which his Plan W1 ranks tenth in compactness as opposed to the State's Plan II, which ranks fifteenth.[14] Cooper notes that *Reock* reflects a concern for distance and travelling time between points within the district and that the lesser distances involved indicate that constituents would be better served by Representatives who must travel within each district to exchange views with voters. The State points out that under *Reock* only District Three in Plan W1 is compact, and that this is achieved by making District One in that Plan less compact that any other district in either Plan II or Plan W1. Neither expert advocated the *Schwartzberg* test, probably because under its cutoff point, none of the six districts in Plans II or W1 is compact. Nevertheless, we note that the *Schwartzberg* test likewise demonstrates that Plan II, ranking fifth, is more compact than Plan W1, ranking eleventh.[15]

Physical characteristics of West Virginia are significant to the determination of compactness issues. To the extent that it was not specifically covered by record evidence, the Court takes judicial notice of the State's unique geographical configurations. There are two narrow panhandles. The northern panhandle, consisting of four counties, extends between the borders of Ohio and Pennsylvania. The eastern panhandle, consisting of eight counties and part of a ninth, is bordered by Maryland and Virginia. This is compounded, of course, by the irregular boundaries of counties within the State, which are largely determined by rivers and mountain ranges. Finally, these problems must be reconciled with the West Virginia constitutional requirement that districts be drawn with adherence to county lines. Likewise, we judicially notice: the mountainous terrain throughout the State with particularly rugged portions of the Appalachian range in the south and southwest; the fairly long and broad valleys formed by the Ohio and Kanawha Rivers; the contrast in quality of road transportation between areas served by Interstate Highways 64, 68, 70, 77, 79, and 81 and those serviced by often poorly developed mountain highways in various parts of the State; the sharply contrasting concentrations of population, for example, Kanawha County has an official population of 207,619 and a total area of 913.338 square miles while the contiguous Clay County has a population of 9,983 and a total area of 346.61 square miles; and that this sharp variation between the few areas of concentrated populations and sparsely populated contiguous areas exists throughout the State. As an example of the legislative factoring of these circumstances, Plan K presented a better technical compactness picture than Plan II or any other viable Plan, but the geographical and population problems unique to West Virginia decisively mitigate against that Plan.

## III. Applicable Law

The Supreme Court held in *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), that Article I, Section 2 of the United States Constitution requires "that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." *Id.* at 8, 84 S.Ct. at 530 (footnote omitted). For a State to meet the "as nearly as practicable" requirement, "the State must make a good-faith effort to achieve precise mathematical equality" between and among congressional districts. *Kirkpatrick v. Preisler*, 394 U.S. 526, 530–31, 89 S.Ct. 1225, 1228–29, 22

---

**14.** Again, considering only Plan II and the sixteen viable Plans, Plan K is first followed by Plans L; EE; A; J; I; GG; V1; HH; U1, W1, BB, and CC (tie); DD; II; and C and Y (tie).

**15.** Plan K is first followed by Plans HH; I; L; II; V1; J; BB; U1; GG; W1; EE; DD; A; CC; and C and Y (tie).

Considering the rankings as a whole, Plan K consistently rates as the most compact Plan under all of the tests, while Plans C and Y consistently rank as the least compact. Plans HH, I, and L rank higher than Plan II on all of the tests, while Plans J and BB rank higher than Plan II on two of the tests. Plan II ranks higher than Plans V1, U1, W1, GG, EE, DD, AA, and CC on two of the tests. Overall, Plan II is more compact than ten of the plans with a lower population variance and less compact than a six of them. Plan W1 is more compact than seven of the sixteen viable Plans and less compact that nine of them.

L.Ed.2d 519 (1969) (citing *Reynolds v. Sims,* 377 U.S. 533, 577, 84 S.Ct. 1362, 1389–90, 12 L.Ed.2d 506 (1964)).

 The Court refined the *Wesberry* requirements in *Kirkpatrick* and in *Karcher v. Daggett,* 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983), creating a two-step test for determining the constitutionality of congressional reapportionment legislation (hereafter *"Karcher* test").[16] Under the *Karcher* test, the party challenging the constitutionality of a congressional redistricting plan bears the burden of proof of first showing that "the population differences among districts could have been reduced or eliminated altogether by a good faith effort to draw districts of equal population." *Id.* at 730–31, 103 S.Ct. at 2658. If the party challenging the redistricting plan can demonstrate that the population variations could have been avoided, "the burden of proving that each significant variance between the districts was necessary to achieve some legitimate goal" shifts to the State. *Id.* at 731, 103 S.Ct. at 2658 (citing *Kirkpatrick,* 394 U.S. at 532, 89 S.Ct. at 1229–30; *Swann v. Adams,* 385 U.S. 440, 443–44, 87 S.Ct. 569, 571–72, 17 L.Ed.2d 501 (1967)). *Kirkpatrick* and *Karcher* reject any *de minimis* standard for meeting the "as nearly as is practicable" standard, instead requiring that each redistricting plan be analyzed independently. *Kirkpatrick,* 394 U.S. at 530, 89 S.Ct. at 1228; *Karcher,* 462 U.S. at 731, 734, 103 S.Ct. at 2658–59, 2660.

While *Karcher* did not specify how the State might meet its burden in step two, it did give several examples of legislative policies that might justify some variance among the populations of the State's various congressional districts. *Karcher* specifically stated that "making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives" may legitimate minor population deviations among congressional districts. *Id.* at 740, 103 S.Ct. at 2663.

*Karcher* also made clear that the burden borne by the State varies inversely with the magnitude of the population variation:

> The showing required to justify population deviations is flexible, depending on the size of the deviations, the importance of the State's interests, the consistency with which the plan as a whole reflects those interests, and the availability of alternatives that might substantially vindicate those interests yet approximate population equality more closely.

*Id.* at 741, 103 S.Ct. at 2664.

 Beyond the two-step test explained in *Kirkpatrick* and *Karcher,* the Supreme Court has set forth a number of other policies that are applicable in congressional redistricting cases. First, there is a strong policy of deference to state legislatures in devising legislative redistricting plans. The Supreme Court has repeatedly stated that "redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to preempt." *Wise v. Lipscomb,* 437 U.S. 535, 539, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978). Further, a federal district court "should follow the policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution" in the context of congressional reapportionment. *White v. Weiser,* 412 U.S. 783, 795, 93 S.Ct. 2348, 2355, 37 L.Ed.2d 335 (1973). Finally, the Supreme Court held that "court-ordered reapportionment plans are subject in some respects to stricter standards than are plans developed by a state legislature." *Upham v. Seamon,* 456 U.S. 37, 42, 102 S.Ct. 1518, 1521, 71 L.Ed.2d 725 (1982). Turning to our ultimate task, we consider the determination of whether West Va.Code § 1–2–3 meets the requirements of the United States and West Virginia Constitutions.

---

**16.** *Kirkpatrick* involved a Missouri redistricting plan in which the overall relative range in the districts was 5.97%. *Karcher* involved a New Jersey redistricting plan in which the overall relative range in the districts was 0.6984%.

## IV. West Va.Code § 1–2–3

### A. *First Prong of Karcher Test*

■ The first prong of the two-part *Karcher* test requires this Court to determine whether the population variances among West Virginia's three congressional districts under West Va.Code § 1–2–3 could have been reduced or eliminated by a good-faith effort of the Legislature. *Karcher,* 462 U.S. at 730–31, 103 S.Ct. at 2658.

In *Karcher,* the Supreme Court, referring to the plan involved in the New Jersey reapportionment it there considered, concluded that "the maximum population deviation of the [congressional redistricting] plan [could be reduced] merely by shifting a handful of municipalities from one district to another." *Id.* at 739, 103 S.Ct. at 2663. Because the Supreme Court determined the population deviations among the districts reflected real differences among the districts, it concluded that the party objecting to the New Jersey plan had met its burden under the first prong of the test. *Karcher* teaches that if any plan (other than the one under judicial attack) would reduce or eliminate population differences among the congressional districts, the plaintiff has met its burden under the first prong of *Karcher.*

West Virginia, however, arguing for more restrictive criteria for shifting the burden of proof to the State, quotes the transitional language from *Karcher.* "If, however, the plaintiffs can establish that the population differences were not the result of a good-faith effort to achieve equality, the State must bear the burden of proving that each significant variance between districts was necessary to achieve some legitimate goal." *Id.* at 731, 103 S.Ct. at 2658. They argue that the word "significant," which modifies "variance" in part two of the *Karcher* test, also modifies "population differences" in part one of the *Karcher* test. Therefore, they argue, the burden does not shift to the State unless the population differences in the State-adopted plan are significant. Defendants conclude that a variance of 230 from the ideal in District One, 95 from the ideal in District Two, and 326 from the ideal in District Three under the congressional redistricting plan embodied in West Va.Code § 1–2–3 are not significant as a matter of law and that therefore Stone has failed to satisfy the first prong of the *Karcher* test.

This Court has several problems with the State's reading of *Karcher.* First, the Supreme Court emphasized that the good-faith effort required to satisfy the first prong of the constitutional standard was a good faith effort to reduce the population differences to zero. The Supreme Court said: "To accept the legitimacy of unjustified, though small population deviations in this case would mean to reject the basic premise of *Kirkpatrick* and *Wesberry....* [W]e have required that absolute population equality be the paramount objective of apportionment ... in the case of congressional districts...." *Id.* 462 U.S. at 732–33, 103 S.Ct. at 2659. The Court could not have been clearer in its final emphasis: "We thus affirm that there are no *de minimis* population variations, which could practicably be avoided, but which nonetheless meet the standard of Art. I, § 2, without justification." *Id.* at 743, 103 S.Ct. at 2665.

Second, the clear implication in *Karcher* is that if a plan with a smaller variation exists, the party challenging the plan has met its burden. *See Id.* at 738–39, 103 S.Ct. at 2662–63. The Court stated that "the claim that political considerations require population differences among congressional districts belongs more properly to the second level of judicial inquiry in [congressional redistricting] cases ..." *Id.* at 738, 103 S.Ct. at 2662. Finally, *Kirkpatrick,* which originally established the two-step plan for testing the constitutionality of redistricting plans, indicated that "the State must justify each variance, no matter how small." *Kirkpatrick,* 394 U.S. at 531, 89 S.Ct. at 1229.[17]

---

17. We recognize the vitality of the State's argument that if many factors are considered, the population variances resulting from the enactment of Plan II is not significant. If the rule were as the State contends, we would find on the ground that a relative variance of 556 per-

Under *Karcher*, plaintiffs satisfy their burden under the first prong if they demonstrate that the population deviations among the congressional districts under West Va.Code § 1-2-3 could have been reduced or eliminated by the adoption of a different plan that was before the Legislature when it enacted West Va.Code § 1-2-3. Because seventeen other plans with a lower overall variance were before the Legislature during its regular and special session, the Court concludes that Stone has satisfied his burden. Accordingly, the burden then shifts to the State to justify the population variations.

### B. *Second Prong of Karcher Test*

 Under *Karcher*, once the party challenging a redistricting plan has met its burden under prong one of the test, the State has the burden of showing that each population variance was necessary to achieve some legitimate goal. *Karcher*, 462 U.S. at 731, 103 S.Ct. at 2658-59. The State's burden of proving the constitutionality of congressional reapportionment legislation is flexible: the smaller the population deviation, the greater the importance of the State's interests, and the more consistently the plan as a whole reflects the State's interests, the smaller the State's burden of proof. *Id.* at 741, 103 S.Ct. at 2664. This Court must also consider whether any other plans with lesser population variations are available that would substantially vindicate the State's interests. *Id.*

The State relies upon two legitimate goals to justify the population variances in West Va.Code § 1-2-3: preserving the cores of previous districts and maintaining district compactness. This Court therefore must determine whether these goals justify the population variations in West Va.Code § 1-2-3 and whether the goals and the manner in which they are achieved satisfy *Karcher*.

### 1. Preserving the Cores of Prior Districts

The State asserts that Plan II better preserves the cores of three current districts, One, Three, and Four, than Plan W1 or any other Plan with a lower population variance that the Legislature had before it. The State, relying upon Senator Wooton's explanation on the Senate floor, contends that "preserving district cores" means keeping as many of the current congressional districts intact as possible. Stone disagrees with the State's definition of a district core, arguing that "district core" must be determined historically, i.e., that a district core consists of those counties that have been together in the same district for most of the history of the State.

The Supreme Court, while stating that preserving cores of prior districts is a legitimate goal that may justify population variances, has not stated what constitutes a district core. That Court, in counseling deference to state legislative bodies, however, has made it clear that "redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to preempt." *Wise v. Lipscomb*, 437 U.S. 535, 539, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978).

We think that principle has application here. There is merit to the arguments of both Stone and the State concerning how to reduce the concept of "core" to definitional practicability. The State Legislature, however, considered both arguments and chose the one now advanced by the State in this litigation, that preserving district cores means keeping as many of the current congressional districts intact as possible.

If the Legislature's reasoning suffered from fundamental flaw or was unsubstantiated by any factual support, we would be slow in deferring to its judgment. We have found, however, that there is a reasonable factual basis for its conclusion that Plan II better preserves the cores of prior districts than any of the sixteen viable

sons out of a population of 1,793,477 is not significant; that the West Virginia Legislature made a good faith effort to draw districts of equal population; and that plaintiffs failed to satisfy their burden under part one of the

*Karcher* test. As we stated *supra*, however, our understanding of *Karcher* is that the significance of the variation in this context is not in and of itself controlling because there are no *de minimis* considerations.

Plans [18] and we cannot say that its reasoning is grounded other than on pursuing a policy which in the Legislature's judgment would benefit its constituency.

### 2. Compactness

The State next argues that the variance in Plan II is constitutionally justified because one of the principal goals pursued in designing and enacting it was to maintain compactness within each congressional district. *Karcher*, 462 U.S. at 471, 103 S.Ct. at 2664. Significantly enhancing that argument is the West Virginia State constitutional requirement found in Article One, Section Four, that "districts shall be formed of contiguous counties, and be compact." W.VA. CONST. art. I, § 4.

■ We are not called upon to decide between competing federal and state requirements of compactness in designing congressional districts. Compactness is not an explicit requirement of the United States Constitution but the pursuit of that concept as a legitimate goal can, as we have noted, justify small population variances which would otherwise violate the equal population requirements as explained in *Karcher, Kirkpatrick*, and *Wesberry*. We can visualize no badge of legitimacy more remarkable than a state constitutional requirement that complements the federal Constitution.

The concept of compactness is elevated to the federal constitutional level by both the majority opinion and Justice Stevens' concurring opinion in *Karcher. Karcher*, 462 U.S. at 740, 755–58, 103 S.Ct. at 2663, 2672–74. Although it has not been defined, Justice Stevens, in noting favorably the *Reock* test, the *Schwartzberg* test, and the aggregate length test (the parties' "perimeter test"), recognized compactness as a geographic measure. *Id.* at 756 n. 19, 103 S.Ct. at 2673 n. 19 (Stevens, J., concurring). Interestingly, the creator of the *Reock* test

utilized by both the expert for Stone and the expert for the State has acknowledged that such geographical measure may not be probative in determining compactness in states with unusual boundary configurations.[19] Be that as it may, the Legislature and both experts utilized the total perimeter test, *Reock* test, and *Schwartzberg* tests in reviewing the compactness of the new congressional districts under Plan II and the sixteen viable Plans.

Just as we are not called upon to decide between competing federal and state requirements of compactness, in our view, any attempt to choose among the redistricting plans for approximations of compactness would not be dispositive of the issue we consider. Nor do we think such a mathematical judgment is probative of the State's choice of the goal of compactness as a justification for the population variance resulting from the adoption of Plan II.

We have, of course, reviewed the methodology used by Cooper and Butler in arriving at their calculations. Butler's results appear to be based upon a more rigorous analysis of the data and are, therefore, better measures of compactness. Butler has calculated his results based upon the longitude and latitude of each West Virginia county as supplied by the Bureau of the Census and corrected for elevation. Cooper indicated that his data comes from the West Virginia Blue Book, which in turn was supplied by the West Virginia Geological and Economic Survey. Cooper does not indicate that his data is corrected for elevation.

After reviewing the experts' calculations and considering the floor debate and record evidence, we have come to the view that Plan II follows the West Virginia constitutional dictate that districts be compact. The West Virginia Constitution does not

---

**18.** As this Court noted in its findings of facts, West Va.Code § 1–2–3 better preserves the cores of three prior district than any of the sixteen viable Plans. Plan II severs only two counties with a population of 47,252, while Plan HH, which is the next best Plan, severs four counties with a population of 115,265. *See supra* note 11 and accompanying text.

**19.** Professor Reock has written, "In states such as Oklahoma and Maryland, with sparsely populated 'panhandles,' some districts must inevitably lack compactness." *Reock*, "Measuring Compactness as a Requirement of Legislative Apportionment," 5 Midwest J.Pol.Sci. 70, 73–74 (1961).

define compactness but imposes upon the State Legislature the obligation to consider it as a principal factor in apportioning congressional districts. The Legislature was aware both of the state constitutional requirement and the effect of compactness in the federal constitutional equation. We think it has been adequately demonstrated that each legislative body kept the concept of compactness as a principal goal of its redistricting efforts and did this primarily in pursuit of fulfilling its State constitutional obligations. The fact that there were other Plans that would be deemed more compact than Plan II under the three tests employed by the experts does not detract from the Legislature's effort. In the legislative view, the districts in Plan II were compact as the Legislature viewed that requirement under the West Virginia Constitution, and in weighing that and other legitimate legislative goals it was acting preeminently in a role reserved to a state legislature by the United States Supreme Court. *Karcher,* 462 U.S. at 740, 103 S.Ct. at 2663; *Wise,* 437 U.S. at 539, 98 S.Ct. at 2497; *White,* 412 U.S. at 795, 93 S.Ct. at 2355.

### 3. West Virginia Has Justified the Population Variance

Under *Karcher,* a congressional districting plan that varies from the population ideal may be upheld if the State articulates legitimate goals that the plan advances. West Virginia has argued that Plan II best preserves prior district cores and maintains compactness, two policies that the *Karcher* Court recognized as legitimate. *Karcher,* 462 U.S. at 740, 103 S.Ct. at 2663. Considering the two stated goals together, West Va.Code § 1–2–3 better preserves the cores of prior districts while maintaining compactness than any of the sixteen viable Plans with a lower population variance. Because the relative population variance in Plan II is only 0.09%, the State's burden to justify the population deviations is correspondingly light. *Id.* at 741, 103 S.Ct. at 2664. This Court concludes that the State has met its burden. Under the United States Constitution as interpreted by *Karcher* and *Kirkpatrick,* West Va.Code

§ 1–2–3 meets the requirement of one person, one vote.

Stone also argues that under the West Virginia Constitution, the Legislature is required to adopt the plan with the least population variance, without regard for any other factors. As this Court previously noted, Article I, Section 4 of the West Virginia Constitution requires that congressional districts "be formed of contiguous counties, and be compact." W.VA. CONST. art. I, § 4. Article I, Section 4 also requires that: "Each district shall contain as nearly as may be, an equal number of population." *Id.*

The very language of the West Virginia Constitution makes it abundantly clear that equality of population is not the only factor to be considered in apportioning districts: contiguity and compactness are also required. As a three judge panel reviewing the constitutionality of a prior West Virginia congressional redistricting plan noted: "We believe ... that such a requirement in a state constitution that is otherwise in harmony with the Constitution of the United States, as the Constitution of West Virginia is, may and ought to be taken into account and given appropriate consideration by the legislature, *along with all other relevant factors,* in its overall consideration of the subject." *West Virginia Civil Liberties Union v. Rockefeller,* 336 F.Supp. 395, 399 (1972) (emphasis added). As recognized by the United States Supreme Court, maintaining compactness and preserving the cores of prior districts are relevant factors in selecting among redistricting plans. As the Supreme Court noted in *Karcher:* "[W]e are willing to defer to state legislative policies, so long as they are consistent with constitutional norms, even if they require small differences in the population of congressional districts." *Karcher,* 462 U.S. at 740, 103 S.Ct. at 2663. Accordingly, the West Virginia Legislature's consideration of compactness and preserving prior district cores in reapportioning the State's congressional districts was completely proper and in accordance with the West Virginia Constitution. Such policies were consistent and

were rationally applied. Stone's argument must be and is rejected.

## V. Conclusion

 We conclude that West Va.Code § 1–2–3, providing for the State's congressional redistricting based upon the 1990 census, resulted in population variances which under *Karcher v. Daggett*, 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983), must be justified to withstand constitutional scrutiny. In our view, the State has met its burden of showing legitimate justification for the variances by demonstrating that the Legislature in designing and enacting Plan II was guided in large part by its pursuit of the legitimate State goals of preserving as many of the cores of prior districts as possible and in obtaining the greatest degree of compactness practicable that is also consistent with its goal of preserving the cores of previous districts.

We hold that Chapter One, Article Two, Section Three of the West Virginia Code meets the equal population requirements of the United States and West Virginia Constitutions. The relief sought by Stone is DENIED and this case is DISMISSED from the docket of this Court.

DISMISSED.

## APPENDIX

Congressional Plan II

**Congressional Plan W1**

August 8, 1991
M-8-8-1

LEGEND

--- County/Parish

Dist Plan (con2)

District 1
District 2
District 3

Population

District 1: 597,819

District 2: 597,834

District 3: 597,824

Overall Range (Pop):15

Plan90

Public Systems Associates
303 E 17th Ave, Ste 110
Denver, Colorado 80203
Copyright (c) 1990