730 S.E.2d 368

STATE of West Virginia ex rel. Thornton COOPER, Petitioner

v.

Natalie E. TENNANT, Secretary of State of The State of West Virginia and Richard Thompson, Speaker of The West Virginia House of Delegates, Respondents

State of West Virginia ex rel. Stephen Andes and Joseph Haynes, Individually And In official Capacities As Members of The County Commission of Putnam County, West Virginia; Brian Wood, Individually And In official Capacity As Putnam County Clerk; Bob Baird, Myles Epling and Rick Handley, Individually And In official Capacities As Members of The County Commission of Mason County, West Virginia; and Diana Cromley, Individually And In official Capacity As Mason County Clerk, Petitioners

v.

Natalie E. Tennant, Secretary of State of The State of West Virginia and Richard Thompson, Speaker of The West Virginia House of Delegates, Respondents

State of West Virginia ex rel. County Commission of Monroe County, By and Through Its Members: Michael Shane Ashley, Clyde Gum, Jr., and William Miller, Petitioners

v.

Richard Thompson, Speaker of The West Virginia House of Delegates; and Natalie E. Tennant, Secretary of State of The State of West Virginia, Respondents

State of West Virginia ex rel. Eldon A.

Callen, Jim Boyce, Petra Wood, John Wood and Frank Deem, Petitioners

v.

Natalie E. Tennant, Secretary of State of The State of West Virginia, Respondent

State of West Virginia ex rel. Thornton Cooper, Petitioner

v.

Natalie E. Tennant, Secretary of State of The State of West Virginia, Respondent.

Nos. 11–1405, 11–1447, 11–1516, 11–1517, 11–1525.

Supreme Court of Appeals of West Virginia.

Submitted Nov. 17, 2011.

Decided Feb. 13, 2012.

Dissenting Opinion of Justice Benjamin July 20, 2012.

586

Thornton Cooper, Pro Se, South Charleston, WV.

Jennifer Scragg Karr, Winfield, WV, for Petitioners Andes et al.

Jeffrey A. Pritt, Pritt Law Firm Union, WV, for Petitioners Monroe County Commissioners.

Roger D. Forman, Daniel T. Lattanzi, The Law Office of Roger D. Forman, Charleston, WV, for Petitioners Callen et al.

Thomas W. Rodd, Assistant Attorney General, Charleston, WV, for Respondent Tennant.

Anthony J. Majestro, Powell & Majestro, Charleston, WV, for Respondent Thompson.

Robert M. Bastress, III, DiTrapano, Barrett & DiPiero, Charleston, WV, for Amici Curiae WV AFL–CIO and WV Citizens Group.

McHUGH, J.:

This matter is before this Court upon the filing of a petition for writ of mandamus by Thornton Cooper, No. 11–1405; petitions for writs of prohibition by Stephen Andes, et al., No. 11–1447 and by the Monroe County Commission, No. 11–1516; and petitions for writs of mandamus by Eldon Callen, et. al., No. 11–1517, and by Thornton Cooper, No. 11–1525. Petitioners Andes and Monroe County Commission challenge the constitutionality of House Bill 201 ("HB 201"), which is redistricting legislation regarding the West Virginia House of Delegates that was adopted by the West Virginia Legislature (hereinafter "Legislature"), effective August 21, 2011. Petitioner Callen, et. al., challenges the constitutionality of Senate Bill 1006 ("SB 1006"), which is redistricting legislation regarding the West Virginia Senate that was adopted by the Legislature, effective August 5, 2011. Petitioner Cooper challenges the constitutionality of both the House of Delegates and Senate redistricting plans.

This Court issued a Rule to Show Cause on all writs, and oral arguments were heard on this matter on November 17, 2011. Subsequent to this Court's thorough review of the constitutional provisions at issue, the briefs and submissions before this Court, the arguments of counsel, and applicable precedent, this Court entered an order on November 23, 2011, concluding that neither HB 201 nor SB 1006 violates the West Virginia Constitution. We now issue this opinion to explain the basis for our November 23, 2011, order.

I. Factual and Procedural History

On August 5, 2011, the Legislature enacted SB 1006, West Virginia Code § 1–2–1 (2011), and on August 21, 2011, the Legislature enacted HB 201, West Virginia Code § 1–2–2 (2011). These legislative redistricting plans were prompted by the 2010 census results regarding the population of this state. According to the 2010 census, the overall population of West Virginia increased slightly from 1,808,344 (per the 2000 census) to 1,852,994. Notably, the official population counts of each of the state's fifty-five counties revealed there to be significant losses in population in the Northern Panhandle and Southern counties and significant growth in population in Monongalia County and the Eastern Panhandle counties.

The House of Delegates redistricting process began with the appointment of a House Select Committee on Redistricting (hereinafter "Committee"), comprised of thirty members from all regions of the state, with Majority Leader Brent Boggs serving as the Committee Chair. The Committee created a website and provided information about the redistricting process and an opportunity for

public response. The culmination of the Committee's work was presented on August 5, 2011, as House Bill 106. Although the Senate passed House Bill 106, technical errors were subsequently discovered, and the governor vetoed the bill on August 17, 2011. A substitute bill, HB 201, was introduced to correct the errors and was adopted by the Legislature and made effective August 21, 2011. The resulting statute, West Virginia Code § 1–2–2, created sixty-seven delegate districts. Of those sixty-seven districts, twenty are multi-member districts and forty-seven are single-member districts, an increase over the prior forty-three single-member districts. The twenty multi-member districts include one district with five members; two districts with four members; six districts with three members; and eleven districts with two members. The West Virginia population of 1,852,994 was divided among the 100 delegates for an ideal population size of 18,-530 per delegate. The deviation from that ideal population under the House of Delegates redistricting plan ranges from –5% to +4.99% for a total deviation of 9.99% from ideal population.[1] HB 201 does not include any explanation regarding the Legislature's

rationale underlying its various decisions in creating the districts, combining and splitting counties, or assigning multiple multi-member delegate districts.[2]

Petitioners Thornton Cooper, Stephen Andes, and Monroe County Commission challenge the constitutionality of the House of Delegates redistricting plan. Respondents Natalie Tennant, as Secretary of State, and Richard Thompson, as Speaker of the House of Delegates, maintain that the House redistricting plan is not violative of the West Virginia Constitution.[3] The specific assertions of these petitioners and respondents are addressed below.[4]

Redistricting of the Senate was initiated on or about March 31, 2011, when Acting Senate President Jeffrey Kessler formed a bipartisan redistricting task force which was comprised of one member from each of the seventeen senatorial districts. The task force conducted twelve public hearings throughout the state during which it solicited public comment on Senate redistricting. Petitioner Cooper attended each of the twelve hearings and, *inter alia*, also submitted to the task force a detailed plan he proposed for redis-

1. "The maximum population deviation is calculated by determining the range of population deviation between the largest and smallest districts from the 'ideal population' of a district. Thus, where a plan includes no district with a population more than 5% under or 5% over the 'ideal district population,' the plan is within the 10% range and thus meets Federal population equality requirements (± 5% standard)." *McClure v. Sec'y of Commonwealth*, 436 Mass. 614, 766 N.E.2d 847, 851 (2002) (footnotes and citations omitted).

However, as discussed in more detail below, state legislative redistricting plans with maximum population deviations in excess of 10%, *prima facie*, violate equal protection, "and the burden shifts to the state to show that the plan 'may reasonably be said to advance' consistently applied, rational and legitimate state policies." *Deem v. Manchin*, 188 F.Supp.2d 651, 656 (quoting *Mahan v. Howell*, 410 U.S. 315, 328, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973)).

2. Moreover, given this matter's presentation in original jurisdiction, this Court does not have the benefit of a record, trial testimony, exhibits, or expert opinion. Thus, our consideration of Petitioners' constitutional challenges of the redistricting legislation is limited to our review of the parties' arguments and the submitted appendices, including, *inter alia*, maps and data relating to both the House of Delegates and Senate dis-

tricting set forth in HB 201 and SB 1006. No testimonial evidence from participating legislators or experts explaining the specific process undertaken by the Legislature in the formulation and passage of the House and Senate bills is before this Court. As discussed in more detail below, SB 1006 sets forth those interests the Legislature intended to serve in its redistricting plan. In contrast, as previously stated, the Legislature did not present any written explanation of its policy interests or rationale for particular decisions regarding crossing county lines or creating certain multi-member districts with regard to HB 201. A judicial determination of the constitutionality of the ultimate legislative plan would have been significantly assisted by written findings similar to those produced by the Legislature with regard to SB 1006.

3. The Court also wishes to acknowledge the informative amici curiae brief filed by the West Virginia AFL–CIO and the West Virginia Citizens Action Group.

4. Petitioners do not dispute that the methods utilized by the Legislature in this case are identical to the methods utilized by the Legislature in prior redistricting plans and upheld in previous cases, as discussed below.

tricting the West Virginia Senate. Similarly, according to his petition, Petitioner Eldon Callen participated in a public hearing in Marion County, during which he advocated for counties to be kept whole and not divided into and among separate senatorial districts.

Following the public hearings, legislation proposing redistricting of the state senatorial districts was adopted by both legislative chambers and, effective August 5, 2011, SB No. 1006, the "Senate Redistricting Act of 2011," was enacted. SB 1006 clearly sets forth the policy interests the Legislature sought to serve in the redistricting plan, providing, in relevant part, as follows:

> (c) The Legislature recognizes that in dividing the state into senatorial districts, the Legislature is bound not only by the United States Constitution but also by the West Virginia Constitution; that in any instance where the West Virginia Constitution conflicts with the United States Constitution, the United States Constitution must govern and control, as recognized in section one, article I of the West Virginia Constitution; that the United States Constitution, as interpreted by the United States Supreme Court and other federal courts, requires state legislatures to be apportioned so as to achieve equality of population as near as is practicable, population disparities being permissible where justified by rational state policies; and that the West Virginia Constitution requires two senators to be elected from each senatorial district for terms of four years each, one such senator being elected every two years, with one half of the senators being elected biennially, and requires senatorial districts to be compact, formed of contiguous territory and bounded by county lines. The Legislature finds and declares that it is not possible to divide the state into senatorial districts so as to achieve equality of population as near as is practicable as required by the United State Supreme Court and other federal courts and at the same time adhere to all of these provisions of the West Virginia Constitution; but that, in an effort to adhere as closely as possible to all of these provisions of the West Virginia Constitution, the Legislature, in dividing the state

into senatorial districts, as described and constituted in subsection (d) of this section, has:

> (1) Adhered to the equality of population concept, while at the same time recognizing that from the formation of this state in the year 1863, each Constitution of West Virginia and the statutes enacted by the Legislature have recognized political subdivision lines and many functions, policies and programs of government have been implemented along political subdivision lines;

> (2) Made the senatorial districts as compact as possible, consistent with the equality of population concept;

> (3) Formed the senatorial districts of 'contiguous territory' as that term has been construed and applied by the West Virginia Supreme Court of Appeals;

> (4) Deviated from the long-established state policy, recognized in subdivision (1) above, by crossing county lines only when necessary to ensure that all senatorial districts were formed of contiguous territory or when adherence to county lines produced unacceptable population inequalities and only to the extent necessary in order to maintain contiguity of territory and to achieve acceptable equality of population; and

> (5) Also taken into account in crossing county lines, to the extent feasible, the community of interests of the people involved.

W.Va.Code § 1–2–1.

Petitioner Cooper, a Kanawha County resident and registered voter, seeks a writ of mandamus from this Court ordering Respondent Secretary of State, Natalie Tennant, "not to process any of the certificates of announcement filed by" state senatorial candidates for the 2012 election "as if those certificates of announcement had been filed with respect to the [senatorial] districts described in" SB 1006. He requests instead that this Court order Respondent Secretary of State to process said certificates of announcement "as if they had been filed with respect to the senatorial districts set forth in his most recent redistricting plan, unless . . .

the Legislature passes a bill that redistricts the State Senate in a manner that is consistent with" the West Virginia Constitution and signed by the governor.

Petitioners Eldon Callen, Jim Boyce, Petra Wood and John Wood are residents of Monongalia County and Petitioner Frank Deem is a resident of Wood County. (Hereinafter these petitioners will be collectively referred to as "Petitioner Callen"). Petitioner Callen also filed a petition for writ of mandamus requesting that this Court declare SB 1006 unconstitutional and "issue a temporary redistricting plan compliant with state constitutional requirements and/or to order the responsible state officials to redraw the senatorial districts in compliance with the West Virginia Constitution."

As Respondent Secretary explains, she is the constitutional officer designated with authority to enforce certain provisions of SB 1006. In response to the challenges to the constitutionality of the Senate redistricting plan, she contends that the districting decisions encompassed within SB 1006 are not violative of the West Virginia Constitution.

## II. Standard of Review

The constitutional challenges presented in this case are before this Court as petitions for writs of prohibition and mandamus. These extraordinary forms of relief are designed to remedy miscarriages of justice and have consistently been used sparingly and under limited circumstances. Entitlement to the extraordinary remedy of mandamus requires three fundamental elements:

Before this Court may properly issue a writ of mandamus three elements must coexist: (1) the existence of a clear right in the petitioner to the relief sought; (2) the existence of a legal duty on the part of the respondent to do the thing the petitioner seeks to compel; and (3) the absence of another adequate remedy at law.

Syl. Pt. 3, *Cooper v. Gwinn*, 171 W.Va. 245, 298 S.E.2d 781 (1981); *see also* Syl. Pt. 1, *Meadows v. Lewis*, 172 W.Va. 457, 307 S.E.2d 625 (1983). With regard to the issuance of a writ of prohibition, this Court explained as follows in syllabus point one of

*Hinkle v. Black*, 164 W.Va. 112, 262 S.E.2d 744 (1979):

In determining whether to grant a rule to show cause in prohibition when a court is not acting in excess of its jurisdiction, this Court will look to the adequacy of other available remedies such as appeal and to the over-all economy of effort and money among litigants, lawyers and courts; however, this Court will use prohibition in this discretionary way to correct only substantial, clear-cut, legal errors plainly in contravention of a clear statutory, constitutional, or common law mandate which may be resolved independently of any disputed facts and only in cases where there is a high probability that the trial will be completely reversed if the error is not corrected in advance.

This Court's examination of these constitutional challenges is necessarily premised upon syllabus point one of *State ex rel. Appalachian Power Company v. Gainer*, 149 W.Va. 740, 143 S.E.2d 351 (1965), in which this Court explained the standard for reviewing the constitutionality of a statute, as follows:

In considering the constitutionality of a legislative enactment, courts must exercise due restraint, in recognition of the principle of the separation of powers in government among the judicial, legislative and executive branches. Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question. Courts are not concerned with questions relating to legislative policy. The general powers of the legislature, within constitutional limits, are almost plenary. In considering the constitutionality of an act of the legislature, the negation of legislative power must appear beyond reasonable doubt.

*Id.* at 740, 143 S.E.2d at 353; *accord* Syl. Pt. 4, *State ex rel. Cities of Charleston, Huntington & its Counties of Ohio & Kanawha v. West Virginia Econ. Dev. Auth.*, 214 W.Va. 277, 588 S.E.2d 655 (2003); Syl. Pt. 1, *West Virginia Trust Fund, Inc. v. Bailey*, 199 W.Va. 463, 485 S.E.2d 407 (1997). This

Court has also observed that "[t]here is a presumption of constitutionality with regard to legislation." Syl. Pt. 6, in part, *Gibson v. West Virginia Dept. of Hwys.,* 185 W.Va. 214, 406 S.E.2d 440 (1991).

In syllabus point one of *Foster v. Cooper,* 155 W.Va. 619, 186 S.E.2d 837 (1972), this Court stated the very important principle that "[t]he Constitution of West Virginia being a restriction of power rather than a grant thereof, the legislature has the authority to enact any measure not inhibited thereby." In syllabus point three of *Willis v. O'Brien,* 151 W.Va. 628, 153 S.E.2d 178 (1967), this Court addressed the presumption of constitutionality and explained as follows: "When the constitutionality of a statute is questioned every reasonable construction of the statute must be resorted to by a court in order to sustain constitutionality, and any doubt must be resolved in favor of the constitutionality of the legislative enactment."

This Court has consistently recognized its properly limited and circumspect role in the review of legislative action [5] and has invariably acknowledged that it cannot be "concerned with the legislative policy which motivated the enactment" of the legislation in question. *State ex rel. Blankenship v. Richardson,* 196 W.Va. 726, 731, 474 S.E.2d 906, 911 (1996). Indeed, this Court has consistently held that it does not "sit as a superlegislature, commissioned to pass upon the political, social, economic or scientific merits of statutes pertaining to proper subjects of legislation. It is the duty of the legislature to consider facts, establish policy, and embody that policy in legislation." *Boyd v. Merritt,* 177 W.Va. 472, 474, 354 S.E.2d 106, 108 (1986). The duty of this Court, when petitioned, is to determine the constitutionality of the legislation. *Farley v. Graney,* 146 W.Va. 22, 48, 119 S.E.2d 833, 848 (1960).

In examining the authority granted to the Legislature by the West Virginia Con-stitution and specifically within the context of a challenge to legislative redistricting, this Court stressed in *Robertson v. Hatcher,* 148 W.Va. 239, 135 S.E.2d 675 (1964), that the West Virginia Constitution is "a restriction of power rather than a grant of power." 148 W.Va. at 250, 135 S.E.2d at 682–83.[6] Consequently, the "test of legislative power in this State is constitutional restriction, and what the people have *not* said in the organic law their representatives shall not do, *they may do." Id.* at 251, 135 S.E.2d at 683 (quoting *Harbert v. County Court,* 129 W.Va. 54, 39 S.E.2d 177 (1946) and emphasis supplied). When considering a challenge to the constitutionality of an act of the legislature, the " 'negation of legislative power must be manifest beyond reasonable doubt.' " Syl. Pt. 4, in part, *State ex rel. Metz v. Bailey,* 152 W.Va. 53, 54, 159 S.E.2d 673, 674 (1968) (citation omitted).

The precise question to be examined in the evaluation of a constitutional challenge is whether the legislative act is prohibited by the West Virginia Constitution. This concept was also elucidated in syllabus point one of *Metz,* as follows: "Inasmuch as the Constitution of West Virginia is a restriction of power rather than a grant of power, as is the federal Constitution, the Legislature may enact any measure not interdicted by that organic law or the Constitution of the United States." 152 W.Va. at 53, 159 S.E.2d at 673.

Accordingly, a facial challenge to the constitutionality of legislation is the most difficult challenge to mount successfully. The challenger must establish that no set of circumstances exists under which the legislation would be valid; the fact that the legislation might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid.

*Lewis v. Canaan Valley Resorts, Inc.,* 185 W.Va. 684, 691, 408 S.E.2d 634, 641 (1991).

5. "The legislative, executive and judicial departments of the government must be kept separate and distinct, and each in its legitimate sphere must be protected." Syl. Pt. 1, *State ex rel. Miller v. Buchanan,* 24 W.Va. 362 (1884).

6. In *Robertson,* this Court invalidated a statute providing a delegate to each of twelve counties which had populations of less than three-fifths of the ideal population based upon the entire state's population, finding that it was unconstitutional under article VI, section 6.

Moreover, in addressing the constitutional restraints under which the Legislature acted in these matters, this Court must also be cognizant of the political considerations surrounding legislative decisions. As the United States Supreme Court recognized in *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), "[p]olitics and political considerations are inseparable from districting and apportionment." 412 U.S. at 753, 93 S.Ct. 2321. In *Stone v. Hechler*, 782 F.Supp. 1116 (N.D.W.Va.1992), the federal district court rejected a challenge to the legislative redistricting plan in West Virginia and explained that "[t]he Supreme Court has repeatedly stated that 'redistricting and reapportioning legislative bodies is a legislative task which the [courts] should make every effort *not* to preempt.'" 782 F.Supp. at 1124 (quoting *Wise v. Lipscomb*, 437 U.S. 535, 539, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978) and emphasis supplied). Thus, as Intervenor Richard Thompson, Speaker of the West Virginia House of Delegates, stated in his response in this case, "[o]nce one recognizes the inherent political nature of the redistricting process, the idea that the political branches should have plenary power unless they contravene clear constitutional limitations becomes unassailable." [7]

With these standards of review as guidance, this Court proceeds to an evaluation of the issues presented in this case.

### III. Summary of Challenges to House of Delegates Redistricting

#### A. Petitioner Cooper

Petitioner Cooper requests that this Court issue a writ of mandamus requiring the implementation of his proposed redistricting plan, rather than the plan adopted by the Legislature. He posits that his redistricting proposal contains certain features which render it preferable to the redistricting plan adopted by the Legislature, with specific regard to the preservation of existing precinct and county boundaries and the utilization of multi-member districts. [8] Specifically, Petitioner Cooper contends that his plan, creating 100 single-member districts, would have preserved existing precinct boundaries, minimized county boundary crossing in the creation of districts, and created only one-member districts.

Petitioner Cooper further asserts that the redistricting plan, as adopted by the Legislature, violates Article VI, Sections 6 and 7 [9] of

---

**7.** In *South Carolina State Highway Department v. Barnwell Brothers*, 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734 (1938), the United States Supreme Court observed that where a given evaluation presents "a legislative not a judicial choice, its constitutionality is not to be determined by weighing in the judicial scales the merits of the legislative choice and rejecting it if the weight of evidence presented in court appears to favor a different standard...." 303 U.S. at 191, 58 S.Ct. 510. "Being a legislative judgment it is presumed to be supported by facts known to the legislature unless facts judicially known or proved preclude that possibility." *Id.*

**8.** Compared to the legislative plan that resulted in a 9.99% overall deviation from ideal population per delegate, Petitioner Cooper's plan would have resulted in a 7.55% deviation from that ideal population.

**9.** Article VI, Section 6 of the West Virginia Constitution provides as follows: "For the election of delegates, every county containing a population of less than three fifths of the ratio of representation for the House of Delegates, shall, at each apportionment, *be attached to some contiguous county or counties, to form a delegate district.*" (Emphasis supplied). The "three fifths of the ratio" computation in the present case would require the division of the 1,852,993 population of West Virginia by the 100 delegates, resulting in 18,529 people per delegate (also referenced as the ideal population per delegate). Three-fifths (60%) of that ideal population is 11,117. Twelve counties in West Virginia have populations below 11,117.

Article VI, Section 7 of the West Virginia Constitution provides:

After every census the delegates shall be apportioned as follows: The ratio of representation for the House of Delegates shall be ascertained by dividing the whole population of the state by the number of which the House is to consist and rejecting the fraction of a unit, if any, resulting from such division. Dividing the population of every delegate district, and of every county not included in a delegate district, by the ratio thus ascertained, there shall be assigned to each a number of delegates equal to the quotient obtained by this division, excluding the fractional remainder. The additional delegates necessary to make up the number of which the House is to consist, shall then be assigned to those delegate districts, and counties not included in a delegate district, which would otherwise have the largest fractions unrepresented; but every delegate district and county not included in a delegate

the West Virginia Constitution by failing to require that a county remain whole when it is attached to another county or counties, pursuant to the requirements of article VI, section 6, and by permitting the splitting of counties into various delegate districts. Petitioner Cooper also claims that the legislative plan violates Article II, Section 4 of the West Virginia Constitution and the Fourteenth Amendment to the United States Constitution. Article II, Section 4 of the West Virginia Constitution provides for equal representation, as follows: "Every citizen shall be entitled to equal representation in the government, and, in all apportionments of representation, equality of numbers of those entitled thereto, shall as far as practicable, be preserved." The pertinent portion of the Fourteenth Amendment to the United States Constitution provides: "No State shall ... deny to any person within its jurisdiction the equal protection of the laws."

Petitioner Cooper further challenges the "delegate residency dispersal" provision of HB 201 for House of Delegate District 28, a multi-member district, which specifies that no more than one delegate may be nominated, elected or appointed who is a resident of a single county within the district. District 28 consists of portions of Monroe, Raleigh, and Summers Counties. Petitioner Cooper contends that this delegate residency dispersal violates the provisions of Article IV, Section 4 and Article VI, Sections 12 and 39 of the West Virginia Constitution. Article IV, Section 4 of the West Virginia Constitution provides:

> No person, except citizens entitled to vote, shall be elected or appointed to any state, county or municipal office; but the governor and judges must have attained the age of thirty, and the attorney general and senators the age of twenty-five years, at the beginning of their respective terms

of service; and must have been citizens of the state for five years next preceding their election or appointment, or be citizens at the time this constitution goes into operation.

Article VI, section 12 provides: "No person shall be a senator or delegate who has not for one year next preceding his election, been a resident within the district or county from which he is elected; and if a senator or delegate remove from the district or county for which he was elected, his seat shall be thereby vacated." Article VI, section 39 generally prohibits the passage of "local or special laws."

### B. Petitioner Andes

Petitioner Stephen Andes, a County Commissioner for Putnam County, and other named officials and citizens of Putnam and Mason Counties,[10] (hereinafter collectively referred to as "Petitioner Andes") also seek a writ of prohibition enjoining the implementation of HB 201. Petitioner Andes asserts that portions of Mason and Putnam Counties have been impermissibly joined with portions of other adjacent counties to form delegate districts. In similar fashion to the arguments raised by Petitioner Cooper, Petitioner Andes asserts that adherence to county boundaries should be a paramount consideration except where equal representation principles dictate otherwise. Specifically, Petitioner Andes suggests that article VI, section 6 envisions keeping each county whole when it is attached to another county or counties where necessary to satisfy population variances.[11]

Petitioner Andes further suggests that the redistricting plan enacted by the Legislature is the result of partisan gerrymandering. Petitioner essentially asserts that this Court should ignore the jurisprudence of the Unit-

district, shall be entitled to at least one delegate.

**10.** Joining Mr. Andes in filing the petition for writ of prohibition are Joseph Haynes, individually and in his official capacity as a member of the Putnam County Commission; Brian Wood, individually and in his capacity as Putnam County Clerk; Bob Baird, Myles Epling and Rick Handley, individually and in their official capaci-

ties as members of the Mason County Commission; and Diana Cromley, individually and in her official capacity as Mason County Clerk.

**11.** Petitioner Andes' brief suggests that "[t]he culmination of provisions in Article VI are plainly written to indicate that 'delegate district' means 'county' or 'counties', but not mere portions of a county or counties, are to be combined for purposes of representation in the House."

ed States Supreme Court in *Vieth v. Jubelirer*, 541 U.S. 267, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004), which held that no identified judicially manageable criteria exist governing a determination of issues of alleged partisan gerrymandering claims, and should invalidate the redistricting adopted by the Legislature.

## C. Petitioner Monroe County Commission

Petitioner Monroe County Commission [12] asserts challenges to the House of Delegates redistricting plan similar to those asserted by Petitioners Cooper and Andes. It alleges a violation of article VI, sections 6 and 7 based upon the Legislature's splitting of counties with insufficient (less than the 3/5 threshold of 11,117) population when combining such counties with other counties for purposes of redistricting. Petitioner maintains that because Monroe County's population was not appreciably altered during the most recent census period, it should not be subjected to splitting. Specifically, the 2010 census indicated that Monroe County has a population of only 13,502. Thus, to create a district, it needed to be combined with an additional 4,103 people to achieve the ideal population of 18,530. Petitioner also contends that an implied preference exists in the West Virginia Constitution for single-member districts.

## IV. Historic Perspective in Analysis of Challenges to Legislative Redistricting

At the outset of this Court's examination of the legislative redistricting plans presently at issue, it must be acknowledged that, ordinarily, challenges to such plans have been adjudicated in federal court because violations of federal constitutional provisions are often al-

leged. Thus, the jurisprudence which guides our consideration of these issues is derived, in part, from the analyses undertaken in that federal realm.

The federal equal representation principles, commonly referenced as "one person, one vote," were articulated by the United States Supreme Court in *Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). Those principles, with foundations in the Equal Protection Clause of the Fourteenth Amendment, are aimed at prohibiting the dilution of individual voting rights through state redistricting plans that assign delegates to districts in a manner which results in wide variances in population per district.[13] In *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the United States Supreme Court held that "the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis." 377 U.S. at 568, 84 S.Ct. 1362. The *Reynolds* Court, in an attempt to assure that each person's vote is given the same weight, required states to "make an honest and good faith effort to construct districts ... as nearly of equal population as is practicable." *Id.* at 577, 84 S.Ct. 1362. In *Reynolds*, the United States Supreme Court established that "the overriding objective must be substantial equality of population among the various districts." [14] *Id.* at 579, 84 S.Ct. 1362.

Importantly, a principle established in *Gaffney* and guiding this Court in the present case is that a total deviation from an ideal district size of less than 10% in state

---

**12.** Petitioner Monroe County Commission filed a petition for writ of prohibition by and through its members, Michael Shane Ashley, Clyde Gum, Jr., and William Miller.

**13.** The United States Supreme Court declared redistricting issues justiciable in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The *Baker* decision provided the foundation for the evaluation of claims and necessitated redistricting throughout the country in order to conform to federal standards.

**14.** However, as the United States Supreme Court explained in *Reynolds*, the Equal Protection Clause of the Fourteenth Amendment to the Unit-

ed States Constitution authorizes legislative redistricting to be subject to a test of practicality.

By holding that as a federal constitutional requisite both houses of a state legislature must be apportioned on a population basis, we mean that the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable. We realize that it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters. Mathematical exactness or precision is hardly a workable constitutional requirement.

377 U.S. at 577, 84 S.Ct. 1362.

legislative redistricting was *prima facie* constitutional under the Equal Protection Clause of the Fourteenth Amendment.[15] 412 U.S. at 745, 93 S.Ct. 2321. As the principles of "one person, one vote" evolved, the United States Supreme Court observed that although population equality should be a primary goal, some flexibility must be granted to states in the formulation of redistricting plans, and only "substantial" population equality is required. The United States Supreme Court also articulated this allowance for state legislative redistricting deviation in Brown v. Thomson, 462 U.S. 835, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983), explaining as follows:

> In view of these considerations, we have held that minor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State. Our decisions have established, as a general matter, that an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations.

462 U.S. at 842, 103 S.Ct. 2690. Through the *Gaffney* and *Brown* decisions, the United States Supreme Court acknowledged that states are permitted a substantial degree of latitude in evaluating factors which may affect the division of states into voting districts. For instance, in *Bush v. Vera*, 517 U.S. 952, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996), the United States Supreme Court found that redistricting responsibility has been delegated to the political branches of the states and that the Supreme Court has "accorded substantial respect to ... traditional principles (as those, for example, meant to preserve the integrity of neighborhood communities, to protect incumbents, to follow existing political boundaries, to recognize communities of interest, and to achieve compactness and contiguity)...." 517 U.S. at 1048, 116 S.Ct. 1941.

Specific evaluation of provisions of the West Virginia Constitution governing redistricting was undertaken in *Goines v. Rockefeller*, 338 F.Supp. 1189 (S.D.W.Va.1972). In that case, the district court reviewed this state's 1971 redistricting legislation and addressed the constitutional provisions at issue in the present case. The plaintiffs in *Goines* contended that the provisions of West Virginia Constitution Article VI, Sections 6 and 7 were violated under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.[16] The plaintiffs argued that strict application of West Virginia's constitutional provisions, without due regard to the federal principles of equal representation, resulted in significant disparities in the population of delegate districts designated in the 1971 redistricting. That redistricting plan resulted in an 83% deviation from population equality among various districts and a 2.26 to 1 ratio between the most populated district and the least populated district. *Id.* at 1194. The district court held that the 83% deviation unconstitutionally violated the federal standards of equal representation, and the district court consequently invalidated the 1971 redistricting plan. The court did not, however, invalidate the provisions of West Virginia Constitution Article VI, Sections 6 and 7. *Id.* at 1196.

Subsequently, in *Goines v. Heiskell*, 362 F.Supp. 313 (S.D.W.Va.1973), the United States District Court reviewed the redistricting legislation that resulted from the decision in *Rockefeller*. *See* 338 F.Supp. at 1189. The 1973 redistricting examined in *Heiskell* involved the creation of eleven multi-county

---

**15.** The parties do not dispute that legislative redistricting plans enacted by the West Virginia Legislature and at issue in this case are within that range articulated by federal standards. A more detailed discussion of this equal protection principle is included in our subsequent analysis of SB 1006.

**16.** To the extent that state constitutional provisions are in conflict with equal protection rights guaranteed under the United States Constitution, the state provisions must yield. *See Reynolds,*

377 U.S. at 584, 84 S.Ct. 1362. State legislative redistricting has been significantly affected by the application of these federal equal protection mandates of the decisions of the United States Supreme Court. State legislatures have been increasingly aware of their responsibility to adhere to these principles and to adopt redistricting measures that respond to the changing population and achieve a result that deviates no more than 10% from an ideal district size.

districts, twenty-five multi-member districts, and twelve districts crossing county lines, resulting in a 16.179% maximum population variance among the delegate districts. 362 F.Supp. at 318.[17] Similar to arguments presented in the case *sub judice,* the plaintiffs in *Heiskell* argued that the Legislature's failure to observe county boundaries was constitutionally flawed under article VI, sections 6 and 7. *Id.* at 321. The district court rejected the challenges to the 1973 legislation, finding that the 16.179% variance was "tolerable and acceptable when considered with other legitimate interests . . . ." *Id.* at 323.

With specific regard to the crossing of county boundary lines, such practice was approved by the court in *Heiskell,* and it was determined that by crossing such lines, "the percentage population variance in the two districts has been reduced." *Id.* at 321. Several districts were also required to have delegate residency dispersal among the counties thereof, an issue also raised in the challenges asserted in the case *sub judice.* In explanation for the conclusion that the statute at issue in *Heiskell* was valid, the district court noted that the county boundary crossing was permissible[18] and that the delegate residency dispersal requirement was also allowed and favored by the West Virginia Attorney General, as counsel for defendant, who explained that the plan would " 'assure every geographic area of having a more effective voice in the Legislature.' " *Id.* at 320.

Furthermore, the *Heiskell* court reiterated the restrained role of judicial review of legislative redistricting and concisely articulated that the legislative process of redistricting is a *political* function premised upon innumerable factors. 362 F.Supp. at 317. The *Heiskell* court "noted that a myriad of plans may be presented. Benefits and advantages of a good plan may be lost when another good plan with other benefits and advantages is adopted." *Id.* "The many tangible and intangible factors to be considered in a legislative apportionment plan point to the inevitable conclusion that perfection cannot be attained in a workable plan satisfactory to all areas of our population today and tomorrow." *Id.* The *Heiskell* court concluded that "[t]he record before us does not warrant intrusion on or interference with the judgment and discretion vested in and exercised by the Legislature in the discharge of its legislative responsibility . . . ." *Id.* at 323.

In *Holloway v. Hechler,* 817 F.Supp. 617 (S.D.W.Va.1992), the United States District Court for the Southern District of West Virginia again addressed constitutional challenges to the West Virginia House of Delegates redistricting plan. The 1991 redistricting plan created twenty-three multi-member delegate districts and thirty-three single-member districts. 817 F.Supp. at 620.[19] The plaintiffs in *Holloway,* like Petitioner Cooper in the present case, contended that the Legislature should have created 100 single-member delegate districts. *Id.* The district court in *Holloway* rejected that contention and stated that multi-member delegate districts have been in existence in West Virginia since 1872 and are not unconstitutional. The court specified that multi-member districts do not offend the concept of equal representation. *Id.* at 624, n. 8. The *Holloway* court expounded that "[m]ul-

---

**17.** In *Heiskell,* one district was underrepresented by approximately 8% and another district was overrepresented by approximately 8%, with an average percentage population variance of only 4.479%. No violation of equal representation principles was found. 362 F.Supp. at 318.

**18.** The *Heiskell* court also examined the reasoning of the United States Supreme Court in *Mahan v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973). In *Mahan,* the Supreme Court had upheld Virginia's House of Delegates redistricting plan which created 52 single member, multi-member, and floater delegate districts, with a maximum percentage population variance of 16.4%. In response to a challenge to the cross-

ing of county boundaries in the redistricting plan, the *Mahan* Court found that Virginia had delineated a specific intent to maintain the integrity of political subdivision lines, a policy "consistently advanced by Virginia as a justification for disparities in population among districts . . . ." 410 U.S. at 329, 93 S.Ct. 979.

**19.** By comparison, the prior 1982 redistricting plan had created twenty-seven multi-member districts and thirteen single-member districts. The 2011 redistricting at issue in the instant case creates twenty multi-member districts and forty-seven single-member districts. W.Va.Code § 1–2–2.

ti-member districts have been held not to be unconstitutional *per se*." *Id.* at 624 (citing *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980); *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971)). The *Holloway* court further noted the historical significance of the multi-district construct, explaining as follows:

> Moreover, there is Constitutional precedent for the existence of both single-member and multi-member districts in West Virginia. Article 6, sections 8 and 9, of the Constitution of the State of West Virginia, ratified in 1872, established the first delegate districts in the State, all to exist until the next census conducted under the authority of the United States, five of which were multi-member districts, two of them consisting of a single county, and the others consisting of two or more counties, and the remainder of them consisting of single-member districts.

817 F.Supp. at 624, n. 8; *see also Simkins v. Gressette,* 631 F.2d 287, 291 (4th Cir.1980) (finding that "[t]he authorities do not interdict multi-member districts").

The *Holloway* court also addressed the delegate residency dispersal requirement. The court found that multi-member districts in which a member is required to be from a certain portion of the district, referred to as delegate residency dispersal or proviso districts, have been traditionally utilized and have been approved and do not violate the principle of equal representation. 817 F.Supp. at 624–27. In *Holloway,* the district court ultimately concluded that because the population variance from an ideal district did not exceed plus or minus 5%, or a 10% range, the redistricting plan at issue in that case *prima facie* satisfied constitutional equal representation standards. *Id.* at 623. The court also found that a legislature's political goal of attempting to minimize the number of contests between present incumbents is not unconstitutional where the redistricting does not result in "a population malapportionment of unconstitutional magnitude." *Id.* at 628.

In *Deem v. Manchin,* 188 F.Supp.2d 651 (2002), the United States District Court for the Northern District of West Virginia addressed the 2001 West Virginia State Senate legislative redistricting plan and found that it was constitutionally sound despite the fact that it had a greater than 10% population variance and thus lacked *prima facie* constitutional validity. The *Deem* court explained that "[t]here is a strong policy of deference to state legislatures in devising redistricting plans. Redistricting and reapportioning legislative bodies is a legislative task which [courts] should make every effort *not* to preempt." 188 F.Supp.2d at 655 (emphasis supplied). The *Deem* court also held that a "redistricting exercise is ... a balancing process in which one objective must sometimes yield to serve another. This is an exercise peculiarly suited to the give and take of the legislative process. Courts, as a consequence, should be reluctant to substitute their judgment for the legislature's choices." *Id.* at 657.[20]

The extensive precedent analyzing the effect of state constitutional provisions upon legislative redistricting plans demonstrates that the act of redistricting is an inherently political process. Both the complexity in delineating state legislative district boundaries and the political nature of such endeavors necessarily preempt judicial intervention in the absence of a clear, direct, irrefutable constitutional violation. The federal equal protection standards, while not mandating any precise methodology to be utilized by the states in redistricting plans, have articulated one ineluctable prerequisite: where a state legislative redistricting plan results in less than 10% deviation in district populations from the ideal, the plan is not *per se* violative of the principle of equal representation. *Deem,* 188 F.Supp.2d at 655–56. Furthermore, in the absence of a policy delineated by the Legislature or a constitutional amendment mandating such, this Court will not endeavor to apply a standard more strict than the 10% deviation standard commonly adopted throughout the jurisprudence of this

---

20. Historically, matters relating to legislative reapportionment were strictly political questions unanswerable by the judiciary. *See Colegrove v.*

*Green,* 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946).

country.[21] As suggested by Respondent Secretary of State in this matter,

> Once the inquiry goes beyond equal representation (and certain other immutable, historically suspect, and objective criteria like race), other authorized or permissible redistricting factors like compactness, community interest, protection of incumbency, partisan advantage, single-member vs. multi-member, political boundary lines, and even contiguity in some instances, are just that—factors—that are properly part of the legislative balancing process, but only very rarely if ever can serve as the basis for a successful court challenge to redistricting legislation.

Those factors, while relevant to the political discourse underlying the Legislature's determinations and preeminently fascinating to the political and legal scholar, are within the legislative rather than the judicial domain.

## V. Discussion of Specific Challenges to House of Delegates Redistricting

Having thoroughly examined the extensive precedent related to the process of legislative redistricting, this Court first addresses the Petitioners' specific constitutional challenges with regard to HB 201.

### A. Adherence to County Boundaries

 A central theme throughout Petitioners' challenges to the House redistricting plan is the importance of adherence to county boundaries. Petitioner Cooper contends that the article VI, section 6 requirement that a county containing a population of less than 60% of the ratio of representation be attached to some contiguous county or counties to form a district requires the attachment of a "whole" county to another county or counties. However, the modifier "whole" does not appear in the constitutional provision, and the common law addressing these constitutional provisions, as observed above, does not require the attachment of "whole" counties. *See, e.g., Heiskell,* 362 F.Supp. at 318. Furthermore, there is no authority prohibiting the division of a county into portions and thereafter attaching those portions to contiguous portions of adjacent counties to form delegate districts.

Interestingly, as the district court in *Rockefeller* explicitly recognized, albeit in dicta, article VI, sections 6 and 7 do *not* contain a requirement that delegate districts be bounded by county lines. 338 F.Supp. at 1190 n. 2. In the recent decision of *Jefferson County Commission v. Tennant,* —— F.Supp.2d ——, 2012 WL 10500 (S.D.W.Va.2012), stay granted by, *Tennant v. Jefferson County Com'n,* —— U.S. ——, 132 S.Ct. 1140, 181 L.Ed.2d 1014 (2012), the United States District Court for the Southern District of West Virginia addressed the absence of reference to adherence to county lines in the article I provisions governing United States Congressional districting and explained that such absence of "reference to 'lines' in article I casts doubt on the intended meaning therein of the word 'counties,' with the result that the provision should reasonably be construed to contemplate that counties may be subdivided, so long as the district's contiguity remains intact." —— F.Supp.2d at ——, 2012 WL 10500 at *5 (footnote omitted).[22]

Petitioner Andes[23] contends that support for the argument against splitting counties is

---

**21.** *See* Colorado Constitution, Article V, § 46, setting an explicit standard of 5% maximum deviation.

**22.** Petitioner Cooper also suggests that the preservation of election precinct boundaries should have been a paramount consideration in the drafting of redistricting legislation and that his plan is also superior in that regard. He does not, however, offer any statutory, constitutional, or persuasive precedential authority for the contention that the challenged legislation must be invalidated due to its effect upon precinct boundaries. Election precincts do not constitute local political boundaries, and they are subject to alteration for the administrative convenience of voters at any time. *See* W.Va.Code § 3–1–7 (2003). This matter of election precinct boundaries is also later addressed in our discussion relating to the Senate redistricting legislation.

**23.** Petitioner Andes emphasizes the degree to which Putnam and Mason Counties were divided. Putnam County, with a population of 55,486, was divided among five districts in HB 201, having been divided among only three districts prior to this most recent redistricting. Mason County, with a population of 27,324, was divided between two districts. Petitioner Monroe County Commission also asserts that counties should remain whole when combined with other counties and specifies that Monroe County has a

found in the United States Supreme Court opinion of *Mahan v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973). Indeed, as explained above,[24] although *Mahan* held that a state's adherence to county boundary lines is not unconstitutional, the *Mahan* opinion must be read in the context in which the decision was made. The *Mahan* Court premised its conclusion upon a Virginia *state policy* regarding legislative redistricting. That finding, however, does *not* translate into a mandate that failure to abide by county boundary lines in a redistricting plan renders such plan unconstitutional. The Virginia Legislature had specifically relied upon that policy of intent to maintain the integrity of political boundaries in an attempt to justify its 16.4% deviation from ideal population. The West Virginia Legislature has advanced no such policy and does not, to the knowledge of this Court, have such an intent or policy underlying its redistricting determinations. The *Mahan* Court's approval of a particular Virginia redistricting plan as a rational exercise of the state's intent to apportion districts to maintain the integrity of political subdivision lines does not necessitate implementation of a similarly designed plan in West Virginia, either by legislative determination or edict of this Court.

A system premised upon representation of independent, distinct political subdivisions has been highly favored in some jurisdictions, and a respect for the integrity of county lines has been approved by the courts in multiple cases. The United States Supreme Court, in *Reynolds,* observed that "[s]everal factors make more than insubstantial claims that a State can rationally consider according political subdivisions some independent representation in at least one body of the state

legislature, as long as the basic standard of equality of population among districts is maintained." 377 U.S. at 580, 84 S.Ct. 1362.

However, permitting deviations from population-based representation does not mean that each local governmental unit or political subdivision can be given separate representation, regardless of population. Carried too far, a scheme of giving at least one seat in one house to each political subdivision (for example, to each county) could easily result, in many States, in a total subversion of the equal-population principle in that legislative body. This would be especially true in a State where the number of counties is large and many of them are sparsely populated, and the number of seats in the legislative body being apportioned does not significantly exceed the number of counties. Such a result, we conclude, would be constitutionally impermissible.

*Id.* at 581, 84 S.Ct. 1362 (footnote omitted).

The West Virginia Legislature is competent to assess the myriad of alternatives[25] available in redistricting decisions and is charged with the duty to do so. If, however, a particular policy is to be advanced in the creation of legislation or in the evaluative process, its genesis is properly within the chambers of the West Virginia Legislature, rather than the chambers of the Supreme Court of Appeals of West Virginia.[26] In the absence of a constitutional prohibition against splitting counties, this Court will not intervene in the political process of the legislative redistricting decisions on this matter.

### B. Multi–Member Delegate Districts

■ Petitioners Cooper and Monroe County Commission also assert that the uti-

population of 13,502 and is split between two delegate districts under the challenged redistricting plan.

**24.** *See supra* note 18.

**25.** Notable examples of constitutional specifications regarding retaining whole counties in the districting process include the Ohio and North Carolina models. In the Ohio Constitution, Article XI, Sections 7(A), (B), and (C) require the creation of house districts from one or more whole counties where possible. If impossible based upon population issues, districts are to be created from certain combined whole govern-

mental units, with the last resort being the division of one such governmental unit between two districts. In the North Carolina Constitution, Article II, Sections 3(3) and 5(3), collectively known as the "Whole County Provision," provide that counties shall not be divided in the formation of a senate district or a representative district.

**26.** A contrary result would be the epitome of legislating from the bench and would be a highly inappropriate exercise of the powers of this Court.

lization of multi-member districts should be minimized and that the plan selected by the Legislature is deficient in that regard. Petitioner Cooper contends that his proposed plan is preferable to the plan adopted by the Legislature because it would have eliminated multi-member delegate districts. HB 201, as adopted by the Legislature, includes twenty multi-member delegate districts.

As stated throughout this opinion, the utilization of such districts has existed in the State of West Virginia for almost a century and a half and has withstood numerous constitutional challenges. There is no constitutional, statutory, or other authority prohibiting the utilization of such districts. In fact, as outlined above, several courts addressing redistricting and surrounding issues have specifically approved multi-member districts. *See, e.g., Holloway,* 817 F.Supp. at 624 (finding that multi-member delegate districts are not *per se* unconstitutional).

Petitioners contend that a process utilizing single-member districts has numerous advantages, and indeed, several arguments on this issue have been advanced by scholars nationally. Potential advantages of single-member districting include maintaining communities of interest, respect for local county policies, and geographical compactness. Single-member districts have also been lauded as a method of reducing campaign costs, equalizing the voting process, and increasing accountability to constituents. Again, however, these are inherently political issues to be developed and debated in the legislative realm. The employment of multi-member delegate districts and the splitting of county boundaries in the redistricting process are not *per se* unconstitutional. While single-member districts and adherence to county lines may arguably be preferable from a policy standpoint, this Court will not engage in revision of a legislative decision on redistricting unless constitutional infirmity exists. Simply put, our state constitution does not prohibit a plan containing multi-member delegate districts.

### C. Delegate Residency Dispersal Requirement

■ Petitioner Cooper also asserts that the delegate residency dispersal requirement included in the House of Delegates redistricting plan for District 28, including parts of Monroe, Summers, and Raleigh Counties, is constitutionally impermissible. As noted above, delegate residency dispersal requirements have been a consistent feature of legislative redistricting in West Virginia, have been upheld and have withstood equal protection challenges in numerous cases, and satisfy valid and legitimate constitutional and public policy interests. *See Holloway,* 817 F.Supp. at 627 (holding that delegate residency dispersal requirements do not violate Equal Protection Clause or any other constitutional provision); *Heiskell,* 362 F.Supp. at 320 (rejecting argument that delegate residency dispersal provisions were arbitrarily discriminatory and finding that "[t]he Court cannot say that the Legislature lacked rational reasons and bases for the delegate residency dispersal provisions ...").

Petitioner Cooper concedes that the delegate residency dispersal does not violate the Equal Protection Clause. Instead, he relies on this Court's decision in a county board of education case to support the contention of unconstitutionality. In *Sturm v. Henderson,* 176 W.Va. 319, 342 S.E.2d 287 (1986), this Court addressed a statutory residency requirement that provided that no more than two members of a county board of education could be elected from the same magisterial district. This Court found that such limitation violated West Virginia Constitution Article IV, Section 4, as quoted above, by imposing qualifications for holding office that were not prescribed in the constitution.

Immediately after this Court's invalidation of that methodology in *Sturm* and "[i]n apparent response to *Sturm,*" an amendment[27] was ratified to explicitly permit the use of residency dispersal requirements in connection with school board elections, thus establishing a public policy permitting utilization of such a mechanism. *Adkins v. Smith,* 185

---

**27.** The amendment to West Virginia Constitution Article XII, Section 6 was proposed by House Joint Resolution No. 6, Second Extraordinary Session of 1986, and ratified on November 4, 1986. *Adkins,* 185 W.Va. at 483, 408 S.E.2d at 62.

W.Va. 481, 483, 408 S.E.2d 60, 62 (1991). Prior to the 1986 amendment, West Virginia Constitution Article XII, Section 6 had provided: "The school districts into which any county is now divided shall continue until changed in pursuance of law." Subsequent to that amendment, the section provides:

The school districts into which the state is now divided shall continue until changed pursuant to act of the Legislature: Provided, That the school board of any district shall be elected by the voters of the respective district without reference to political party affiliation. No more than two of the members of such board may be residents of the same magisterial district within any school district.

W. Va. Const. art XII, § 6.

▇▇ Petitioner Cooper, using the *Sturm* rationale, contends that the delegate residency dispersal requirement challenged in the present legislation violates Article IV, Section 4 and Article VI, Section 12, of the West Virginia Constitution, as quoted above, by imposing requirements in excess of those identified by the constitutional provisions as sufficient to permit a candidate to run for public office. The foundation for invalidation of the excess residency requirements in *Sturm* can be distinguished from the circumstances of this case. Of primary importance, *Sturm* was not a redistricting case, in which judicial deference is to be afforded to the Legislature in the complex balancing tasks and policy considerations inherent in the redistricting process. "We have repeatedly and unequivocally stated that we will not find a statute to be unconstitutional unless its constitutional defect appears beyond any reasonable doubt." *State v. Legg*, 207 W.Va. 686, 693–94, 536 S.E.2d 110, 117–18 (2000). "The well settled general rule is that in cases of doubt the intent of the Legislature not to exceed its constitutional powers is to be presumed and the courts are required to favor the construction which would consider a statute to be a general law." Syl. Pt. 8, *State ex rel. Heck's, Inc. v. Gates*, 149 W.Va. 421, 141 S.E.2d 369 (1965). As explained above in the initial summary of our standards of review for this case,

In considering the constitutionality of a legislative enactment, courts must exercise due restraint, in recognition of the principle of the separation of powers in government among the judicial, legislative and executive branches. Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question. Courts are not concerned with questions relating to legislative policy. The general powers of the legislature, within constitutional limits, are almost plenary. In considering the constitutionality of an act of the legislature, the negation of legislative power must appear beyond reasonable doubt.

*Gainer*, at syl. pt. 1, 149 W.Va. at 740, 143 S.E.2d at 353.

The delegate dispersal requirements included in HB 201 serve legitimate public purposes, as noted by Respondent Secretary of State. In her brief, the Secretary explains that the use of delegate residency dispersal is a long-standing practice in West Virginia in multi-member districts and that such dispersal has been repeatedly approved as a valid tool of the legislative process, designed to accomplish the very types of goals Petitioners Cooper and Andes embrace, such as enhancing the potential for residents of a county to elect a delegate from their own county. As noted above, these considerations were addressed by the federal district court in *Heiskell*, quoting from the Attorney General of West Virginia's memorandum submitted in that case, as follows: " 'Residency is merely a qualification added by the Legislature in order to assure every geographic area of having a more effective voice in the Legislature. Such a residence requirement has a long well-based history in West Virginia government.' " *Heiskell*, 362 F.Supp. at 320.

Moreover, a similar challenge alleging the impropriety of excess residency requirements was evaluated and rejected in *State Administrative Board of Election Laws v. Calvert*, 272 Md. 659, 327 A.2d 290 (1974). In that case, a provision of a legislative redistricting plan contained the following require-

ment: " 'In any legislative district which contains more than two counties or parts of more than two counties, and where Delegates are to be elected at large by the voters of the entire district, no county, or part of a county, shall have more than one Delegate residing in it.' " 327 A.2d at 292. The challenger in *Calvert* maintained that even if the dispersal requirement did not violate equal protection principles, it nevertheless imposed "an additional residency restriction on the eligibility of some candidates for election to the General Assembly not authorized by the pertinent constitutional provision" and was consequently inconsistent with the provisions of Maryland Constitution Art. III, Section 9, which provided, in pertinent part, as follows:

"No person shall (be) eligible as a Senator or Delegate, who at the time of his election, is not a citizen of the State of Maryland, and who has not resided therein, for at least three years, next preceding the day of his election, and the last year thereof, in the County, or in the Legislative District of Baltimore City, which he may be chosen to represent, if such County, or Legislative District of said City, shall have been so long established; and if not, then in the County, or City, from which, in whole, or in part, the same may have been formed...."

*Id.* at 298–99. The *Calvert* court held that such a dispersal requirement was not violative of the constitutional eligibility provision, explaining that "*Calvert* sees this as at variance with the districting plan. We do not see it that way." *Id.* at 299.

▆▆▆▆ Petitioner Cooper further asserts that the dispersal requirement violates the prohibition on "local bills," as contained in West Virginia Constitution Article VI, Section 39. This Court has observed that the "special legislation" prohibition is essentially an equal protection clause. *Cimino v. Bd. of Educ.*, 158 W.Va. 267, 275, 210 S.E.2d 485, 490 (1974). It is designed to prevent "arbitrary creation of special classes, and the unequal conferring of statutory benefits."

*State ex rel. City of Charleston v. Bosely*, 165 W.Va. 332, 339–40, 268 S.E.2d 590, 595 (1980).[28] However, this Court has also been heedful in specifying that "we must remember that the mere fact that a statute is 'special' as opposed to 'general' does not automatically lead to a judgment of constitutional infirmity." 165 W.Va. at 344, 268 S.E.2d at 597. The constitution does permit "the enactment of special laws in some circumstances, but only where a general law is not 'proper' and cannot 'be made applicable to the case.' " *Id.*

▆▆▆ In our review of the legislative decision to include a delegate residency dispersal requirement, we adhere to the guidelines of syllabus point one of *Hedrick v. County Court*, 153 W.Va. 660, 172 S.E.2d 312 (1970), which provide as follows: " 'Whether a special act or a general law is proper, is generally a question for legislative determination; and the court will not hold a special act void, as contravening sec. 39, Art. VI. of the State Constitution, unless it clearly appears that a general law would have accomplished the legislative purpose as well.' Point 8 Syllabus, *Woodall v. Darst*, 71 W.Va. 350 [77 S.E. 264, 80 S.E. 367]."

Special legislation is permitted where it serves a valid purpose and a general law cannot be made applicable. In this instance, the delegate residency dispersal requirement serves a valid purpose, as addressed above, and the determination regarding implementation of such a mechanism within the legislation is a question for the Legislature. As this Court stated in *State ex rel. County Court v. Battle*, 147 W.Va. 841, 131 S.E.2d 730 (1963), in discussing the proper use of special laws, "[t]he legislature is generally the judge of such matters." 147 W.Va. at 848, 131 S.E.2d at 735.

### D. Gerrymandering

Petitioner Andes asserts that although the United States Supreme Court has not articulated any defined standards for determin-

**28.** In *Bosely,* this Court held that a restriction of tax authority to specific political subdivisions based on population, found to be detrimental to the remainder of this state, was an inappropriate means through which to implement a statewide program of civic and economic development. Thus, the Court found the provision void under the "special legislation" prohibition. 165 W.Va. at 345, 268 S.E.2d at 598.

ing the constitutionality of partisan gerrymandering, this Court should find that the challenged legislation in the case *sub judice* constitutes unconstitutional partisan gerrymandering.[29] Racially-motivated gerrymandering has consistently been overturned when utilized in the manipulation of district lines. *See Hunt v. Cromartie*, 526 U.S. 541, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) (finding that evidence supported conclusion that state drew lines with impermissible racial motive); *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) (overturning Alabama's attempt to exclude virtually all of Tuskegee's black population from an election district). The type of partisan or political gerrymandering alleged to be in existence in this case presents more complex issues, and many courts have concluded that the issues are beyond judicial cognizance.[30] In *Gaffney*, for instance, the United States Supreme Court explained: "We have not ventured far or attempted the impossible task of extirpating politics from what are the essentially political processes of the sovereign States." 412 U.S. at 754, 93 S.Ct. 2321. The *Gaffney* Court ultimately approved the drawing of a plan for the purpose of equalizing political strengths of two parties. Thereafter, in *Davis v. Bandemer*, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986), although a plurality of the United States Supreme Court found that partisan gerrymandering is justiciable, the justices could not agree on an appropriate test for determining whether the partisan gerrymandering was unconstitutional. A majority of the justices agreed that, at the

very least, relief may only be available upon a showing of discriminatory effect. 478 U.S. at 131–33, 106 S.Ct. 2797.

In *Vieth*, the United States Supreme Court examined the precedent concerning gerrymandering, and the plurality acknowledged that no discernable standards for assessing partisan gerrymandering had emerged, explaining as follows:

> Eighteen years of judicial effort with virtually nothing to show for it justify us in revisiting the question whether the standard promised by *Bandemer* exists. As the following discussion reveals, no judicially discernible and manageable standards for adjudicating political gerrymandering claims have emerged. Lacking them, we must conclude that political gerrymandering claims are nonjusticiable and that *Bandemer* was wrongly decided.

541 U.S. at 281, 124 S.Ct. 1769. As reflected in the above quote, the *Vieth* plurality would have held that such challenges were simply nonjusticiable political questions, but a majority declined to do so. *Id.* at 306, 124 S.Ct. 1769. Thus, as aptly noted by the amici curiae brief of the West Virginia AFL–CIO and West Virginia Citizens Action Group, "the lack of judicially manageable standards has made any challenge to a political gerrymander a political question."

As recently articulated in *Radogno v. Illinois State Bd. of Elections*, 2011 WL 5025251 (N.D.Ill.2011), "[t]he caselaw addressing political gerrymandering claims under the Equal Protection Clause is foggy at best."

---

**29.** The term "political gerrymander" has been defined as "[t]he practice of dividing a geographical area into electoral districts, often of highly irregular shape, to give one political party an unfair advantage by diluting the opposition's voting strength." Black's Law Dictionary 696 (7th ed.1999). Petitioner Andes asserts that the layout of districts in Putnam and Mason Counties appears to be the result of political gerrymandering and an attempt to protect historically Democratic districts while disbanding Republican districts.

**30.** The following intriguing history was presented in *Vieth*, as follows:

> The political gerrymander remained alive and well (though not yet known by that name) at

the time of the framing. There were allegations that Patrick Henry attempted (unsuccessfully) to gerrymander James Madison out of the First Congress. *See* 2 W. Rives, Life and Times of James Madison 655, n.1 (reprint 1970); Letter from Thomas Jefferson to William Short, Feb. 9, 1789, reprinted in 5 Works of Thomas Jefferson 451 (P. Ford ed.1904). And in 1812, of course, there occurred the notoriously outrageous political districting in Massachusetts that gave the gerrymander its name—an amalgam of the names of Massachusetts Governor Elbridge Gerry and the creature ("salamander") which the outline of an election district he was credited with forming was thought to resemble. *See* Webster's New International Dictionary 1052 (2d ed.1945).
> 541 U.S. at 274, 124 S.Ct. 1769.

2011 WL 5025251 at *4.[31] The *Radogno* court opined that *Vieth* and the more recent case of *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 126 S.Ct. 2594, 165 L.Ed.2d 609 (2006), "are cobbled-together plurality opinions that place district courts in the untenable position of evaluating political gerrymandering claims without any definitive standards." *Radogno*, 2011 WL 5025251 at *4. In *Perry*, the United States Supreme Court held that the plaintiffs' claims had to be dismissed because of "the absence of any other workable test for judging partisan gerrymanders." *Perry*, 548 U.S. at 420, 126 S.Ct. 2594. As summarized by Justice Kennedy, writing for the plurality: "a successful claim attempting to identify unconstitutional acts of partisan gerrymandering must ... show a burden, as measured by a reliable standard, on the complainants' representational rights." 548 U.S. at 418, 126 S.Ct. 2594.

Courts and commentators have uniformly struggled with this amorphous issue and have typically concluded that "partisan gerrymanders are justiciable yet unsolvable." David Schultz, *The Party's Over: Partisan Gerrymandering and the First Amendment*, 36 Cap. U.L.Rev. 1 (Fall 2007); *see, e.g., Kidd v. Cox*, 2006 WL 1341302 at *15 (N.D.Ga.2006) ("[T]he Court cannot ascertain from the materials submitted what manageable or politically-neutral standards might exist in this case that would make a political gerrymandering dispute based on the Equal Protection Clause justiciable."); *Shapiro v. Berger*, 328 F.Supp.2d 496, 504 (S.D.N.Y. 2004) (dismissing political gerrymandering claim because Plaintiff had "not suggested any manageable standard under which I could evaluate such a claim if one had been advanced").

Likewise, this Court will not intrude upon the province of the legislative policy determinations to overturn the Legislature's redistricting plan based upon the assertion of partisan gerrymandering. As noted by the plurality in United States Supreme Court in *Bandemer*,

> [T]he mere fact that a particular apportionment scheme makes it more difficult for a particular group in a particular district to elect representatives of its choice does not render that scheme constitutionally infirm.... [A] group's electoral power is not unconstitutionally diminished by the simple fact of an apportionment scheme that makes winning elections more difficult, and a failure of proportional representation alone does not constitute impermissible discrimination under the Equal Protection Clause.

478 U.S. at 131–32, 106 S.Ct. 2797. Gerrymandering, in and of itself, is not unconstitutional and has clearly been deemed acceptable in legislative redistricting decisions. Lacking any authoritative standard by which to definitively judge such matters and absent compelling evidence that any unconstitutional partisan gerrymandering occurred in this matter, no relief is warranted, and Petitioners' claims of gerrymandering must consequently fail.

## VI. Summary of Challenges to Senate Redistricting

Petitioners contend that SB 1006 fails to comport with West Virginia Constitution Article VI, Section 4 insofar as that provision requires senatorial districts to be compact, bounded by county lines and, as nearly as practicable, equal in population.[32] Petition-

---

**31.** "Like a periodic comet, once every ten years this Court sees a challenge to the redistricting of Illinois's state legislative districts." *Radogno*, 2011 WL 5025251 at *1.

**32.** West Virginia Constitution Article VI, Section 4 states:

> For the election of senators, the state shall be divided into twelve senatorial districts, which number shall not be diminished, but may be increased as hereinafter provided. Every district shall elect two senators, but, where the district is composed of more than one county, both shall not be chosen from the same county. The districts shall be compact, formed of contiguous territory, bounded by county lines, and, as nearly as practicable, equal in population, to be ascertained by the census of the United States. After every such census, the Legislature shall alter the senatorial districts, so far as may be necessary to make them conform to the foregoing provision.

Petitioners do not aver that SB 1006 violates that portion of article VI, section 4 requiring that senatorial districts be "formed of contiguous territory."

**608**

ers also contend that the plan violates West Virginia Constitution Article II, Section 4, which provides that "[e]very citizen shall be entitled to equal representation in the government, and, in all apportionments of representation, equality of numbers of those entitled thereto, shall as far as practicable, be preserved."

## VII. Discussion of Challenges to Senate Redistricting

### A. Equality in Population

 First, we note that the parties agree that SB 1006 satisfies the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, which "independently imposes an equal representation requirement on electoral districting." *McClure v. Sec'y of Commonwealth,* 436 Mass. 614, 766 N.E.2d 847, 851 (2002) (*citing Reynolds,* 377 U.S. at 577, 84 S.Ct. 1362). As referenced above, this Court is mindful that under federal case law, where the maximum population deviation of a state legislative redistricting plan is less than 10%, such plan falls within the category of "'minor deviations from mathematical equality among state legislative districts [which] are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State.'" *Brown,* 462 U.S. at 842, 103 S.Ct. 2690 (quoting *Gaffney,* 412 U.S. at 745, 93 S.Ct. 2321); *see Holloway,* 817 F.Supp. at 623. In this case, the parties agree that the ideal district population in each of the seventeen senatorial districts is 109,000. The parties further agree that under SB 1006, the maximum deviation from the ideal population is 9.998%, which satisfies the constitutional requirements of the Equal Protection Clause.

 Even though SB 1006 satisfies federal equal protection requirements, Petitioner Cooper urges this Court to construe our state's equal representation provisions set forth in West Virginia Constitution Article II, Section 4 and Article VI, Section 4 more strictly than federal courts have construed the Equal Protection Clause. *See Pauley v. Kelly,* 162 W.Va. 672, 679, 255 S.E.2d 859, 864 (1979) (stating that "we may interpret our own Constitution to require higher standards of protection than afforded by comparable federal constitutional standards.") West Virginia Constitution Article II, Section 4 provides that "[e]very citizen shall be entitled to equal representation in the government, and, in all apportionments of representation, equality of numbers of those entitled thereto, shall as far as practicable, be preserved." West Virginia Constitution Article VI, Section 4 states, in relevant part, that senatorial districts "shall be . . . as nearly as practicable, equal in population[.]"

Petitioner Cooper argues that the state's constitutional equal representation requirements are violated because, under SB 1006, thirteen counties have been divided such that the population of fifteen of the seventeen senatorial districts deviate more than 2.4% from the ideal population. Petitioner Cooper contends that such a deviation does not satisfy the state constitutional requirement that there be equality in population "as far as" and "as nearly as" "practicable." *See* W.Va. Const. art. II, § 4 and art. VI, § 4. Under the plan proposed by Petitioner Cooper, no more than seven counties would be divided in such a manner that each of the seventeen senatorial districts would deviate from the ideal population less than 2.4%.

Petitioner Cooper urges this Court to follow the United States Supreme Court's decision of *Kirkpatrick v. Preisler,* 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969), in which the State of Missouri argued that the population variances among the congressional districts created in the state's 1967 congressional redistricting plan were "so small that they should be considered de minimis and for that reason to satisfy the 'as nearly as practicable' [33] limitation and not to require indepen-

---

**33.** Prior to *Kirkpatrick,* in *Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), the United States Supreme Court held that "construed in its historical context, the command of Art. I, § 2 [of the United States Constitution], that Representatives be chosen 'by the People of the several States' means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." 376 U.S. at 7, 84 S.Ct. 526. It should be noted that the Supreme Court in *Wesberry* also recognized that "it may not be possible to draw con-

dent justification." *Id.* at 530, 89 S.Ct. 1225 (footnote added). Ultimately, the Court in *Kirkpatrick*

> reject[ed] Missouri's argument that there is a fixed numerical or percentage population variance small enough to be considered de minimis and to satisfy without question the "as nearly as practicable" standard. The whole thrust of the "as nearly as practicable" approach is inconsistent with adoption of fixed numerical standards which excuse population variances without regard to the circumstances of each particular case. The extent to which equality may practicably be achieved may differ from State to State and from district to district. Since "equal representation for equal numbers of people (is) the fundamental goal for the House of Representatives," the "as nearly as practicable" standard requires that the State make a good-faith effort to achieve precise mathematical equality. *See Reynolds v. Sims,* 377 U.S. 533, 577 84 S.Ct. 1362, 1389, 12 L.Ed.2d 506 (1964). Unless population variances among congressional districts are shown to have resulted despite such effort, the State must justify each variance, no matter how small.

*Kirkpatrick, Id.* at 530–31, 89 S.Ct. 1225.[34]

Though Petitioner Cooper seeks to have this Court adopt the reasoning of the United States Supreme Court in *Kirkpatrick* with respect to how West Virginia Constitution Article II, Section 4 and Article VI, Section 4 should be construed, we are not compelled to do so. *Kirkpatrick* involved judicial review of a United States congressional redistricting plan and not that of one or more state legislative bodies as is the case now before this Court. This distinction is not insignificant and was explained in *Karcher v. Daggett,* 462 U.S. 725, 732–33, 103 S.Ct. 2653, 77 L.Ed.2d

133 (1983). In *Karcher,* a congressional redistricting case, the United States Supreme Court specifically noted the rigorous equal population standards of both *Wesberry* and *Kirkpatrick* as applicable to congressional redistricting plans, but not to state redistricting plans.[35] The *Karcher* Court stated that under *Wesberry* and *Kirkpatrick,* "we have required that absolute population equality be the paramount objective of apportionment only in the case of congressional districts, for which the command of Art. I, § 2, as regards the national legislature outweighs the local interests that a State may deem relevant in apportioning districts for representatives to state and local legislatures ... [.]" 462 U.S. at 732, 103 S.Ct. 2653 (emphasis added).

Moreover, in *Brown,* the United States Supreme Court explained that a maximum population deviation of a state legislative redistricting plan of less than 10%, *prima facie,* satisfies the Equal Protection Clause because "some deviations from population equality may be necessary to permit the States to pursue other legitimate objectives such as 'maintain[ing] the integrity of various political subdivisions' and 'provid[ing] for compact districts of contiguous territory.'" 462 U.S. at 842, 103 S.Ct. 2690 (quoting *Reynolds,* 377 U.S. at 578, 84 S.Ct. 1362). The *Brown* Court further recognized that " '[a]n unrealistic overemphasis on raw population figures, a mere nose count in the districts, may submerge these other considerations and itself furnish a ready tool for ignoring factors that in day-to-day operation are important to an acceptable representation and apportionment arrangement.'" *Brown,* 462 U.S. at 842, 103 S.Ct. 2690 (quoting *Gaffney,* 412 U.S. at 749, 93 S.Ct. 2321 and emphasis added); *see also Mahan,* 410 U.S. at 327, 93 S.Ct. 979 (observing that strict population equality rule which applied to congressional redistricting plans

---

gressional districts with mathematical precision ... [.]" *Id.* at 18, 84 S.Ct. 526.

**34.** The Court in *Kirkpatrick* further reasoned that "[w]e can see no nonarbitrary way to pick a cutoff point at which population variances suddenly become *de minimis.* Moreover, to consider a certain range of variances *de minimis* would encourage legislators to strive for that range rather than for equality as nearly as practicable." 394 U.S. at 531, 89 S.Ct. 1225.

**35.** Indeed, it was the strict equal population standards of *Karcher* and *Wesberry* which recently guided the federal district court's decision in *Jefferson County Commission.* As previously noted, *Jefferson County Commission* involved a constitutional challenge to the *congressional* redistricting plan enacted following the 2010 census.

did not apply to plans redistricting state legislatures.)

As indicated above, SB 1006 specifically states that "[t]he Legislature finds and declares that it is not possible to divide the state into senatorial districts so as to achieve equality of population as near as is practicable as required by the United States Supreme Court and other federal courts" while also comporting with the state constitutional provisions requiring, in relevant part, senatorial districts to be compact, contiguous in territory and bounded by county lines. W.Va.Code § 1–2–1. Thus, "in an effort to adhere as closely as possible to" the applicable provisions of the state constitution, the Legislature, in redrawing the senatorial district lines, has "[a]dhered to the equality of population concept, while at the same time recognizing . . . political subdivision lines" and further recognizing the fact that government "functions, policies and programs of government have been implemented along" such lines; "[m]ade the senatorial districts as compact as possible, consistent with the equality of population concept;" and "[f]ormed the senatorial districts of 'contiguous territory.'" *Id.; see Deem,* 188 F.Supp.2d at 656. Other stated policy interests identified in SB 1006 as part of the Legislature's effort to achieve equality of population while also adhering to the requirements of our state constitution include that the plan at issue deviated from political subdivision lines by crossing county lines when necessary to ensure all districts "were formed of contiguous territory or when adherence to county lines produced unacceptable population inequalities and only to the extent necessary in order to maintain contiguity of territory and to achieve acceptable equality of population;" the Legislature also took into account in crossing county lines, "the community of interests of the people involved." *See* W.Va.Code § 1–2–1; *see Deem,* 188 F.Supp.2d at 656. Still, it must be acknowledged that the foregoing policy interests articulated by the Legislature in SB 1006

> will not always be consistent. In some circumstances, they will compete. The redistricting exercise is therefore a balancing process in which one objective must some-times yield to serve another. This is an exercise peculiarly suited to the give and take of the legislative process. Courts, as a consequence, should be reluctant to substitute their judgment for the legislature's choices.

*Id.* at 657.

In *Deem,* the policy interests set forth by the Legislature in the senatorial redistricting plan then at issue were virtually identical to those set forth in SB 1006 and described above. As previously discussed, in *Deem,* the maximum deviation from the ideal population was 10.92%, which exceeded the 10% maximum deviation permissible to be *prima facie* constitutional under equal protection. Thus, the respondents therein were required to demonstrate that the redistricting plan " 'may reasonably be said to advance' consistently applied, rational and legitimate state policies." *Deem,* 188 F.Supp.2d at 656 (quoting *Mahan,* 410 U.S. at 328, 93 S.Ct. 979). The court in *Deem* ultimately upheld the plan, stating that its

> inquiry is limited to whether *this* plan meets the constitutional requirements. Our quest is not to find the best plan, but rather to assess the constitutionality of the plan the legislature has chosen. Here, the deviation from the ideal exceeds only slightly 10%. The legislature has adopted five rational and legitimate policy goals to justify a deviation in excess of 10%. In many respects these goals are competing and must be balanced by the legislature. We cannot conclude from the facts of this case that, in this balancing process, the legislature has failed to meet the requirement that the policies be consistently applied.

*Deem,* 188 F.Supp.2d at 658.

As already established, the present Senate redistricting plan (unlike the plan at issue in *Deem* ) does not exceed the 10% maximum population deviation and, thus, satisfies federal equal protection requirements. Moreover, in the case of SB 1006, its stated policy interests clearly illustrate the balancing exercise necessarily conducted by the Legislature in formulating the parameters of each dis-

trict, a fact not seriously challenged by Petitioners.

In contrast, Petitioner Cooper's proposed plan emphasizes raw population figures, "a mere nose count in the districts," without due consideration of "factors that in day-to-day operations are important to an acceptable representation and apportionment arrangement." *Brown*, 462 U.S. at 842, 103 S.Ct. 2690. Simply put, Petitioner Cooper's mechanistic approach did not involve any legislative "give and take." *Deem*, 188 F.Supp.2d at 657. "While population is the basic factor to be considered in a legislative apportionment plan, other factors are to be examined and weighed." *Heiskell*, 362 F.Supp. at 317. The *Heiskell* court also recognized that there are "many tangible and intangible factors to be considered in a legislative apportionment plan[.]" *Id.* Thus, although Petitioner Cooper's proposed plan may deviate from the ideal population to a lesser degree than SB 1006, the fact that another possibly valid plan may exist does not compel a finding by this Court that the Legislature's chosen plan is unconstitutional.

As previously stated in the discussion of HB 201, this Court is unwilling to disavow the "strong policy of deference to state legislatures in devising redistricting plans. Redistricting and reapportioning legislative bodies [are] a legislative task which … courts should make every effort not to preempt. State policies and state preferences are for a state's elected representatives to decide[,]" and courts should not intercede unless there is a direct constitutional violation. *Deem*, 188 F.Supp.2d at 655 (internal citations omitted)

Accordingly, we find no merit in Petitioners' argument that SB 1006 violates the equality in population provisions of West Virginia Constitution Article II, Section 4 and Article VI, Section 4.[36]

### B. County Line Boundaries

█ Second, Petitioners contend that SB 1006 unjustifiably divides thirteen counties between and among the seventeen senatorial districts and also improperly divides thirty-seven of the state's 1,856 existing election precincts. According to Petitioners, the plan's division of counties and existing election precincts violates West Virginia Constitution Article VI, Section 4, which provides that senatorial districts shall be, *inter alia,* "bounded by county lines." Petitioner Cooper points out that under his proposed plan, no existing election precincts are divided and, furthermore, although his plan divides seven counties in order to achieve acceptable equality in population, the fact that it divides fewer counties than does SB 1006 proves that the Legislature unnecessarily violated the "bounded by county lines" requirement of West Virginia Constitution Article VI, Section 4.

In response, Respondent Secretary contends that a strict adherence to county boundary lines does not supersede all other factors to be considered during the legislative process. Indeed, as previously discussed, with regard to state legislative redistricting following the previous census in 2000, the court in *Deem* stressed that the policy goals of a redistricting plan will "not always be consistent[ ][and][i]n some circumstances they will compete. The redistricting exercise is therefore a balancing process in which one objective must sometimes yield to serve another." 188 F.Supp.2d at 657. As an "exer-

---

**36.** Respondent Secretary posits that SB 1006 varies only slightly from the senatorial redistricting plan approved in *Deem* following the 2000 census. For example, she contends that SB 1006 divides thirteen counties, only two more than were divided in the 2001 plan. Further, Respondent Secretary argues that SB 1006 actually improves upon the 2001 plan in that the latter had a maximum population deviation of 10.92% while SB 1006 has a maximum deviation of 9.998%, which, *prima facie*, satisfies federal equal protection principles. These facts alone, Respondent Secretary argues, demonstrate that SB 1006 is substantially similar to the 2001 plan

upheld as constitutional in *Deem* and thus, preclude a finding by this Court that SB 1006 is unconstitutional. We do not agree and, indeed, find it to be a superficial characterization of the two plans' similarities. For example, even a cursory review and comparison of the two plans reveal that certain counties or portions of counties which were included in a senatorial district under the 2001 plan may no longer be included in that same district under the current plan. Suffice it to say that the two plans are not so similar that a finding of constitutionality of the 2001 plan in *Deem* necessarily and so easily dictates a similar finding in the case *sub judice.*

cise peculiarly suited to the give and take of the legislative process[,]" this Court is reluctant to substitute its judgment for a plan duly chosen by the Legislature. *Id.* According to SB 1006's own stated policy interests, the Legislature crossed county boundary lines "when necessary to ensure that all senatorial districts were formed of contiguous territory or when adherence to county lines produced unacceptable population inequalities and only to the extent necessary in order to maintain contiguity of territory and to achieve acceptable equality of population[.]" W.Va.Code § 1–2–1(c)(4). The Legislature "[a]lso [took] into account in crossing county lines, to the extent feasible, the community of interests of the people involved." W.Va.Code § 1–2–1(c)(5). With no evidence before this Court indicating otherwise, we are constrained to duly consider the legislation's stated policy interests as "the most reliable source of legislative intent." *Deem,* 188 F.Supp.2d at 656.

Moreover, this Court is aware of no constitutional provision precluding the division of election precincts in a state legislative redistricting plan. West Virginia Code § 1–2–2b (2002) provides that "[i]f an election precinct of this state includes territory contained in more than one senatorial or delegate district,

... the county commission of the county in which the precinct is located shall [ ] ... alter the boundary lines of its election precincts so that no precinct contains territory included in more than one senatorial or delegate district." Election precinct boundary modifications and changes are more specifically provided for in West Virginia Code §§ 3–1–5 and –7 (2003). Election precinct boundaries are drawn based upon registered voters rather than population. W.Va.Code § 3–1–5(a).[37] Furthermore, West Virginia Code § 3–1–7 allows county commissions not only to change the boundaries of any precinct located within the county, but also to divide, consolidate or change the location thereof, "whenever the public convenience may require it." W.Va.Code § 3–1–7(a).

We conclude, therefore, that Petitioners' contention that SB 1006, insofar as it divides certain election precincts and crossed county boundary lines, violates West Virginia Constitution Article VI, Section 4, is without merit.[38]

## C. Compactness

 Finally, Petitioners argue that the portion of SB 1006 that establishes senatorial districts 2, 6 and 12 violates the compactness requirement of West Virginia Constitution

---

**37.** For example, while precincts "within any urban center shall contain not less than [300] nor more than [1,500] registered voters[,]" precincts in rural areas "shall contain not less than [200] nor more than [700] registered voters," unless under certain described circumstances the secretary of state makes a determination that there should be an exemption from the 200 voter minimum. W.Va.Code § 3–1–5(a). The statute further provides that "[i]f, at any time the number of registered voters exceeds the maximum number specified, the county commission shall rearrange the precincts within the political division so that the new precincts each contain a number of registered voters within the designated limits." *Id.,* in part.

**38.** We also acknowledge Petitioner Callen's contention that when Monongalia County's three senatorial districts were redrawn under SB 1006, it resulted in the division of several election precincts, including those of two specifically-identified House of Delegate members. Petitioner Callen avers that the election precincts of these delegates were divided by essentially "encircling" their respective residences and thereby moving one of the identified delegates from Senate District 14 into Senate District 13 and the

other from Senate District 13 into Senate District 2, all in an effort to remove them as potential senatorial candidates in Districts 13 and 14. According to Petitioner Callen, the redrawing of the aforementioned senatorial district lines in the manner described creates a presumption that the Legislature intentionally divided these delegates' precincts and that, presumably, the thirty-five other election precincts divided under SB 1006 were also intentionally split. Petitioner Callen argues that in intentionally dividing election precincts, SB 1006—stating, *inter alia,* that it "requir[es] incidental precinct boundary changes"— is inconsistent with the legislation's *intentional* division of precincts. For this reason, Petitioner Callen argues, SB 1006 is unconstitutional.

Other than submitting maps purportedly showing that the election precincts of the two delegates were divided near their respective residences, Petitioner Callen offers no evidence in support of his contention that the precinct divisions were intentionally drawn so as to preclude these delegates from participating as candidates in future senatorial elections. Petitioner Callen's bare allegations are simply not sufficient to prove an improper motive on the part of the Legislature.

Article VI, Section 4 because these districts are, each in its own way, elongated [39] and, therefore, not "compact."

In *Stone v. Hechler*, the district court addressed the constitutionality of a congressional redistricting plan enacted following the 1990 census.[40] 782 F.Supp. at 1118. In considering whether the plan was constitutional even though it deviated from the standard of population equality established in *Karcher*, the district court in *Stone* found that legislators who advocated certain proposed redistricting plans were concerned, among other things, with achieving compactness.[41] 782 F.Supp. at 1121. A discussion of the compactness issue as addressed in *Stone* is highly instructive.

With regard to congressional redistricting, the district court in *Stone* astutely recognized that "[t]he West Virginia Constitution does not define compactness but imposes upon the State Legislature the obligation to consider it as a principal factor in apportioning congressional districts." 782 F.Supp. at 1127–28. This is equally true with regard to the constitutional compactness requirement applied to senatorial redistricting. The *Stone* court also recognized that the "[p]hysical characteristics of West Virginia are significant to the determination of compactness issues." *Id.* at 1123. ˙Indeed, the court took "judicial notice of [*inter alia*] the State's unique geographical configurations[,]" specifically the "two narrow panhandles[,]" one of which "extends between the borders of Ohio and Pennsylvania" and the other as "bordered by Maryland and Virginia." *Id.* The court further noted that "[t]his is compounded, of course, by the irregular boundaries of counties within the State, which are largely determined by rivers and mountain ranges." *Id.* As recognized in *Stone*, the "State's unique geographical configurations" and "the irregular boundaries of counties" therein

must be considered along with the constitutional requirements that "districts be drawn with adherence to county lines[,]" *Id.*, and, we add, along with the other constitutional requirements that districts be contiguous in territory and equal in population as nearly as practicable. *See* W.Va. Const. art. II, § 4 and art. VI, § 4.

Petitioner Cooper avers that Senate Districts 2, 6 and 12 as formulated under his proposed plan are more compact than those districts as provided for in SB 1006. However, this Court will not consider Senate Districts 2, 6 and 12 in isolation; rather, those districts and the other fourteen senatorial districts provided for in SB 1006 all are the result of a legislative balancing process to which this Court is inclined to defer, absent evidence of impropriety beyond reasonable doubt. *See Gainer*, at syl. pt. 1, in part, 149 W.Va. at 746, 143 S.E.2d at 353 ("Courts are not concerned with questions relating to legislative policy. . . . In considering the constitutionality of an act of the legislature, the negation of legislative power must appear beyond reasonable doubt."); *see also Jefferson County Com'n*, —— F.Supp.2d ——, ——, 2012 WL 10500 at *29–30 (considering constitutional challenge to 2010 congressional redistricting plan, court stated that "a proposal's compactness is best evaluated in holistic terms and not by viewing one or two districts in isolation. . . . In that regard, the inclusion of two or three elongated districts among seventeen may be considerably more tolerable than one among three."); *Beaubien v. Ryan*, 198 Ill.2d 294, 260 Ill.Dec. 842, 762 N.E.2d 501, 506 (2001) ("Under Illinois law, the issue of compactness cannot be considered in isolation. The formulation of redistricting plans involves complicated considerations requiring careful study and a weighing of factors. . . . [C]ompactness is but one of several different criteria that legislative and

---

**39.** Senate District 2, under SB 1006, includes the counties of Calhoun, Doddridge, Ritchie, Tyler and Wetzel each in its entirety, as well as portions of Gilmer, Marion, Marshall and Monongalia Counties. Senate District 6 is comprised of all of Mercer County and portions of McDowell, Mingo and Wayne Counties. Senate District 12 consists of all of Braxton, Clay, Harrison and Lewis Counties, and a portion of Gilmer County.

**40.** The plan at issue in *Stone* reduced the number of West Virginia's congressional districts from four to three. 782 F.Supp. at 1118.

**41.** In *Stone*, the court also found that legislators were also concerned "with preserving as much as possible the cores of the existing four districts as they were reduced to three." 782 F.Supp. at 1121.

representative districts must satisfy.") (internal citation omitted); *Legislative Redistricting Cases*, 331 Md. 574, 629 A.2d 646, 654 (1993) (recognizing that " 'the compactness requirement must be applied in light of, and in harmony with, the other legitimate constraints which interact with and operate upon the constitutional mandate that districts be compact in form. Thus, it cannot ordinarily be determined by a mere visual examination of an electoral map whether the compactness requirement has been violated. . . .' ") (internal citation omitted).

As the Court of Appeals of Maryland recognized in *Legislative Redistricting Cases*,

'[i]t is not the province of a judiciary to strike down a district as being noncompact simply because a more geometrically compact district might have been drawn. . . . [T]he function of the courts is limited to assessing whether the principles underlying compactness and other constitutional requirements have been fairly considered and applied in view of all relevant considerations.'

*Id.* (internal citation omitted).

In the present case, whether Senate Districts 2, 6 and 12 might have been drawn to be more geometrically compact is not for this Court to decide. There is a presumption of constitutionality with regard to SB 1006, including the relative compactness of all of the senatorial districts. The shapes of the districts were crafted as a result of the legislative process, which involved the balancing of various concerns. *See In Re Legislative Districting*, 299 Md. 658, 475 A.2d 428, 443 (1984) (stating that "in determining whether there has been compliance with the mandatory compactness requirement, due consideration must be afforded ... to the 'mix' of constitutional and other factors which make some degree of noncompactness unavoidable"). We, therefore, conclude that Senate Districts 2, 6 and 12 do not violate the compactness requirement of West Virginia Constitution Article VI, Section 4.[42]

### VIII. Conclusion

In the absence of constitutional infirmity, as the precedent evaluated above irrefutably establishes, the development and implementation of a legislative redistricting plan in the State of West Virginia are entirely within the province of the Legislature.[43] The role of this Court is limited to a determination of whether the Legislature's actions have violated the West Virginia Constitution. Upon thorough review of this matter, this Court concludes that the West Virginia House of

---

**42.** We note that in *Stone*, the district court had the benefit of, among other things, expert witness opinions regarding the best way to calculate and measure the compactness of the congressional districts in the challenged plan and in other viable plans submitted to the Legislature. 782 F.Supp. at 1122. Both experts in that case "generally agreed that compactness, a relative measure, is difficult to achieve in West Virginia[.]" *Id.* In *Stone*, Petitioner Cooper, who is a political cartographer, testified via affidavit as an expert witness on the issue of compactness and, as in the present case, argued that the best compactness test is the so-called Reock test, which he describes herein as involving the division of the area of a district by the area of the smallest circle that circumscribes that district. If a perimeter of a district is itself a circle, the district would have a score of 1.00. In the present case, Petitioner Cooper argues that under the Reock test, Senate Districts 2, 6 and 12, as they are currently drawn, are not compact. We note, however, that in *Stone*, the district court pointed out that "the creator of the Reock test ... has acknowledged that such geographical measure may not be probative in determining compactness in states with unusual boundary configurations." 782 F.Supp. at 1127 (footnote and citation omitted). Whether, as Respondent Secretary contends, it is therefore untenable for Petitioner Cooper to claim that his proposed Senate Districts 2, 6 and 12 are, under the Reock test, more compact than the present configuration of those districts under SB 1006, we need not now decide.

**43.** While presented in the different context of United States Congressional redistricting, the recent opinion of the United States Supreme Court in *Perry v. Perez*, —— U.S. ——, 132 S.Ct. 934, 181 L.Ed.2d 900 (2012), is also instructive. In that case, the United States Supreme Court defined the role of the courts in legislative redistricting as very limited. The unanimous decision reiterated that redistricting is primarily a task for elected state officials. "That plan reflects the State's policy judgments on where to place new districts and how to shift existing ones in response to massive population growth." *Id.* at 941. The Supreme Court also held that the district court had erred in refusing to split voting precincts. "If a State has chosen to accept the burden of changing its precincts, and its decision to do so is otherwise lawful, there is no warrant for a district court to ignore the State's decision." *Id.* at 944.

Delegates redistricting statute, West Virginia Code, § 1–2–2 (2011), as amended by House Bill 201, adopted by the West Virginia Legislature, effective August 21, 2011, is constitutional. Furthermore, the West Virginia Senate redistricting statute, West Virginia Code § 1–2–1 (2011), as amended by Senate Bill 1006, adopted by the West Virginia Legislature, effective August 5, 2011, is constitutional.

 While Petitioner Cooper's proposed redistricting plan may also satisfy constitutional criteria, that is not the issue before this Court. It is the West Virginia Legislature that is charged with the responsibility for selecting among the infinite number of geographical divisions which would satisfy constitutional requirements. In any examination of a legislative determination, it must be acknowledged that reasonable minds may differ upon such complex issues as the designation of legislative districts, and competing policy considerations may enter the fray. However, the policy choices of those elected to the judicial branch provide no legitimate basis for concluding that a statute is unconstitutional. *See Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979) ("The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted."). As explained in *Jensen v. Kentucky State Board of Elections,* 959 S.W.2d 771 (Ky.1997), "[t]here is a difference between what is perceived to be unfair and what is unconstitutional." 959 S.W.2d at 776. "Our only role in this process is to ascertain whether a particular redistricting plan passes constitutional muster, not whether a better plan could be crafted." *Id.* This Court reiterates that essential principle in this case. The only role of the Supreme Court of Appeals of West Virginia in determining whether a state legislative redistricting plan is constitutional is to assess the validity of the particular plan adopted by the Legislature under both federal and state constitutional principles, rather than to ascertain whether a better plan could have been designed and adopted.

The members of the Legislature elected by the people of this state are assigned the political function of weighing the various factors and considering the multitude of acceptable goals for redistricting. The only mechanism available to this Court for overturning that decision is a finding that the legislative choice is violative of a clearly enunciated constitutional provision.[44] Because the West Virginia Constitution is a restriction of power rather than a grant of power, the Legislature may enact any statute which is not specifically prohibited by constitutional provision.

As the *Heiskell* court aptly concluded in its assessment of challenges to the constitutionality of a redistricting plan, "[a]nother legislature at another time might arrange and compose the delegate districts differently." 362 F.Supp. at 323. "The Court, if obliged to modify the present plan or to compose and effectuate a new plan, might well find logical and substantial reasons for making changes in the districts." *Id.* While "myriads of plans can be conceived and pondered and discussed," it is the duty of this Court to examine *the particular plan* enacted by the Legislature to determine whether it withstands constitutional scrutiny. *Id.*[45] "Many

---

**44.** Another clearly available alternative is a constitutional amendment. An amendment could be proposed stating that the Legislature must adhere to county boundaries while dividing this state into delegate districts or must allow each county to remain whole if a county is to be attached to another county or counties. A related proposal was considered subsequent to the 1960 census. A constitutional amendment, commonly termed the "Fair Representation Amendment," would have provided that every county, regardless of its population, is entitled to at least one delegate in the House of Delegates. In 1962, the West Virginia voters rejected this amendment

by a vote of 176,562 to 287,957. Whether this would have withstood constitutional challenge is a question not currently before this Court.

**45.** *See also Wolpoff v. Cuomo,* 80 N.Y.2d 70, 587 N.Y.S.2d 560, 600 N.E.2d 191, 195 (1992) ("Balancing the myriad requirements imposed by both the State and the Federal Constitution is a function entrusted to the Legislature. It is not the role of this, or indeed any, court to second-guess the determinations of the Legislature, the elective representatives of the people, in this regard. We are hesitant to substitute our own determination

suggested plans may have merit and constitutional and political appeal, but the rejection of one plan in favor of another may bring into play new factors and problems with consequent improprieties and imbalances provoking new and different challenges of validity and constitutionality." *Id.*

As Chief Justice Marshall eloquently stated two centuries ago, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 177, 2 L.Ed. 60 (1803). However, "[s]ometimes ... the law is that the judicial department has no business entertaining [a] claim of unlawfulness—because the question is entrusted to one of the political branches or involves no judicially enforceable rights." *Vieth*, 541 U.S. at 277, 124 S.Ct. 1769 (citations omitted). In the case *sub judice*, this Court finds the redistricting plans for the House of Delegates and the Senate are securely within the realm of the constitutional mandates. Accordingly, this Court denies the requested writs of mandamus and prohibition.

Writs denied.

Justice BENJAMIN concurs in part and dissents in part and reserves the right to file a separate opinion.

### BENJAMIN, J., dissenting, in part:

#### (Filed July 20, 2012)

In its decision, the Majority finds no constitutional violations in either of our Legislature's new redistricting plans. Though I have lingering concerns about our westernmost senatorial district which extends from Mingo County to Mercer County, when viewed as a whole I do not disagree with the Majority that the redistricting plan for the Senate, which creates only multi-member districts with two representatives from each district, satisfies minimum constitutional requirements. No matter where a voter may be in West Virginia, he or she has two, and only two, state senators.

However, I disagree with the majority's holding that the redistricting plan for the House of Delegates, which creates a strange mix of multi-member and single member districts, is constitutional. This particular mix of single and multi-member district representation in the House of Delegates—forty-seven single-member and twenty multi-member districts—impermissibly degrades the influence which a citizen may have *vis-a-vis* citizens elsewhere in the State. In my view, this mix of single and multi-member districts is constitutionally unacceptable.

Although not required by the federal Constitution, our state constitution requires that West Virginians be afforded equal representation in the state's government: "Every citizen shall be entitled to equal representation in the government, and, in all apportionments of representation, equality of numbers of those entitled thereto, shall as far as practicable, be preserved." W. Va. Const. art. 2, § 4. Tied into the requirement of equal representation is the "one person, one vote" standard.[1] When a person is not adequately represented in the government, his vote in electing the official(s) who represent(s) him or her counts for less. In other words, the person's vote is diluted. The concept of a representative democracy is degraded.

The concept of vote dilution is not one that our Court has previously addressed. It has been examined in other courts, both state and federal, and in scholarly publications, but largely in conjunction with § 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973.[2] Here,

---

for that of the Legislature even if we would have struck a slightly different balance on our own.").

**1.** The "one person, one vote" standard was announced in *Gray v. Sanders*, 372 U.S. 368, 381, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963):

The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote.

**2.** Section 2 of the Voting Rights Act involves vote dilution claims related to racial and language minorities. A violation of § 2 occurs

where the "totality of the circumstances" reveal that "the political processes leading to nomination or election ... are not equally open to participation by members of a [protected class] ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."

we are not dealing with the Voting Rights Act. Instead, we are dealing with a redistricting plan that gives much greater voting power to citizens of certain counties while giving little or no voting power to others.

The theory of vote dilution is rooted in the premise that "voting" involves more than just casting a vote. Heather K. Gerken, *Understanding the Right to an Undiluted Vote*, 114 Harv. L.Rev. 1663, 1677 (2001). It recognizes that a voter's representation and voice in government is limited if his vote counts for less than his neighbor's. "Under the structure of our representative system, an individual has the best chance of influencing the political process when she acts as part of a cohesive voting group that can cast its weight behind" a particular candidate or issue. *Id.* at 1678. In West Virginia, the most logical grouping is the county in which one lives. When some groups are given an opportunity to aggregate their votes in an effective way while others are not, the votes of those who cannot aggregate their votes are diluted. When dilution is so great that a citizen's vote does not effectively count, that person has effectively lost the benefit of his right to vote.[3]

Admittedly, it is difficult to design districts so that no vote dilution is ever present because there are many different factors that come into play, such as population, contiguity, compactness, race, preservation of communities of interest, and geography.[4] The factor the United States Supreme Court has declared the touchstone for redistricting is population. *Reynolds v. Sims*, 377 U.S. 533, 568, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ("[T]he seats in both houses of a bicameral state legislature must be apportioned on a population basis."). The legislature is required to design districts of approximately equal population as practically as possible. *Id.* Although population is the primary consideration in developing a redistricting plan, the Legislature may not disregard all other factors. *Goines v. Heiskell*, 362 F.Supp. 313, 317 (S.D.W.Va.1973).

The redistricting plan for the House of Delegates has a maximum population variance of 9.99%. While this maximum population variance is within acceptable bounds denoted by the federal courts,[5] the plan fails to adequately accommodate certain communities and counties. For instance, the redistricting plan splits the population of Kanawha County among seven districts. Of those seven districts, five—districts 35, 36, 37, 39, and 40–are completely within Kanawha County, and ten delegates are distributed among each of those five. Mason County, on the other hand, is split between two districts—districts 13 and 14. Three delegates are dedicated to these two districts, and none of these delegates is dedicated to only Mason County. The residents of Mason County are not currently represented in the House of Delegates by a delegate from Mason County; all three of the delegates from these two districts are residents of Putnam County (which is a more populous county).

Under the redistricting plan, the residents of Mason County are not guaranteed to ever be represented by a delegate that is a resident of that county. Residents of Kanawha County, however, can aggregate their votes through at least ten delegates who are resi-

*Thornburg v. Gingles*, 478 U.S. 30, 43, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) (quoting the Voting Rights Act) (omissions and alterations in original).

3. There is no clearly delineated right to vote in the United States Constitution; however, the West Virginia Constitution does provide the right to vote in art. IV, § 1: "The male citizens of the State shall be entitled to vote at all elections held within the counties in which they respectively reside...." Upon ratification of the Nineteenth Amendment to the United States Constitution in 1920, women became entitled to vote in West Virginia.

4. "The many tangible and intangible factors to be considered in a legislative apportionment plan point to the inevitable conclusion that perfection cannot be attained in a workable plan satisfactory to all areas of our population today and tomorrow." *Goines v. Heiskell*, 362 F.Supp. 313, 317 (S.D.W.Va.1973).

5. As the majority opinion notes, a number of cases have since addressed maximum percentage population variance and concluded that a deviation in populations from the ideal 10% or less is not *per se* violative of the principle of equal representation. *See, e.g., Deem v. Manchin*, 188 F.Supp.2d 651 (N.D.W.Va.2002); *Holloway v. Hechler*, 817 F.Supp. 617 (S.D.W.Va.1992).

dents of Kanawha County. The voters in Kanawha County dilute the voting power of Mason County voters. Depending on election outcomes, Mason County may yet attain a resident delegate, but even if it does, the voting power of Mason County's residents will be at maximum 30% of the voting power of Kanawha County's residents. I find that this discrepancy is incongruent with the "one person, one vote" standard annunciated in *Gray v. Sanders,* 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). Therefore, the redistricting plan for the House of Delegates violates the right to equal representation provided by W. Va. Const. art. 2, § 4.

For this reason, I respectfully dissent.